**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE MAGNUM HUNTER RESOURCES CORP. SECURITIES LITIGATION | No. 13 Civ. 2668 (KBF) <br><br> CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS <br><br> <u>JURY TRIAL DEMANDED</u> |

## TABLE OF CONTENTS

**Page**

I.    NATURE OF THE ACTION ........................................................................1

II.    JURISDICTION AND VENUE ................................................................7

III.    PARTIES……………………………………………………………….8

IV.    CONFIDENTIAL WITNESSES ............................................................15

V.    EXCHANGE ACT CLAIMS...................................................................25

    A.    False and Misleading Omissions ......................................................25

    B.    The Truth Comes To Light .................................................................57

VI.    SECURITIES ACT CLAIMS ................................................................63

VII.    DEFENDANTS' VIOLATIONS OF GAAP AND SEC RULES ....................64

    A.    Defendants' Responsibility for Financial Statements...........................65

    B.    Ineffective Disclosure Controls and Procedures and Internal Control Over Financial Reporting ..........................................................................66

VIII.    CLASS ACTION ALLEGATIONS ........................................................68

IX.    LOSS CAUSATION............................................................................71

X.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE .........................................................................72

COUNT I ....................................................................................................73

COUNT II ...................................................................................................77

COUNT III...................................................................................................79

COUNT IV ................................................................................................................80

COUNT V .................................................................................................................82

PRAYER FOR RELIEF ...........................................................................................83

Lead Plaintiff Edward Paige and Plaintiffs Delaware County Employees Retirement Fund ("DelCo"), Mark Hinnau, and Mike Gretschel (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, allege the following against Magnum Hunter Resources Corporation ("Magnum Hunter" or the "Company"); its Chairman and Chief Executive Officer ("CEO"), Gary C. Evans ("Evans"); its Chief Financial Officer ("CFO"), Ronald D. Ormand ("Ormand"); its former Chief Accounting Officer ("CAO"), David S. Krueger ("Krueger"); its current geologist and Executive Vice President of Exploration, H.C. "Kip" Ferguson, III; its current CAO, Fred J. Smith ("F. Smith"); the signatories of the Company's January 18, 2012 registration statement (the "Registration Statement"); and the underwriters of the Company's May 11, 2012 common stock offering (the "Offering"). Plaintiffs make these allegations upon personal knowledge as to those allegations specifically pertaining to Plaintiffs and, as to all other matters, upon the investigation of counsel, which included, without limitation: review and analysis of public filings made by Magnum Hunter with the U.S. Securities and Exchange Commission ("SEC"); review and analysis of press releases and publications disseminated by Defendants; review of news articles, shareholder communications, conference call transcripts, and postings on Magnum Hunter's website concerning the Company's public statements; interviews with confidential witnesses; and review of other publicly-available information concerning Defendants.

## I.   NATURE OF THE ACTION

1.   This is a federal securities class action against Magnum Hunter and certain of its officers and/or directors for violations of the federal securities laws.  Plaintiffs bring this action on behalf of all persons or entities that purchased or otherwise acquired Magnum Hunter securities between January 17, 2012 and April 22, 2013, inclusive (the "Class Period"),

seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiffs also bring claims on behalf of purchasers in the Company's May 11, 2012 Offering, pursuant to the Securities Act of 1933 (the "Securities Act").   The Exchange Act claims allege that the Company and the Exchange Act Individual Defendants (defined below) intentionally and/or recklessly misstated the adequacy of the Company's internal and financial controls to investors during the Class Period.   As a result of the fraud described below, the Company has lost a substantial portion of its value.   The Securities Act claims are entirely separate claims that arise from the Company's, the Securities Act Individual Defendants' (defined below), and the Underwriter Defendants' (defined below) strict liability for false statements contained in the Company's Registration Statement and incorporated prospectus supplement (the "Offering Documents") for its Offering.

2.      Magnum Hunter is an independent oil and gas company that engages in the acquisition, exploration, exploitation, development and production of crude oil, natural gas and natural gas liquids primarily in West Virginia, Ohio, Texas, Kentucky and North Dakota, as well as in Saskatchewan, Canada.   The Company is active in "three of the most prolific unconventional shale resource plays in North America," namely the Marcellus Shale in West Virginia and Ohio; the Utica Shale in southeastern Ohio and western West Virginia; and the Williston Basin/Bakken Shale in North Dakota and Saskatchewan, Canada.

3.      Although Magnum Hunter has not reported a profitable quarter since its current management team took over in 2009, the Company reported quarter after quarter of tremendous asset growth throughout the Class Period.   Between January 17, 2012 and February 29, 2012, Magnum Hunter reported having increased its total assets 470% during fiscal 2011 (ended December 31 , 2011), growing from $249 million at the end of fiscal 2010 to $1.168 billion at the

end of fiscal 2011; having increased its total proved oil reserves 318% during fiscal 2011, from 6.824 million barrels ("mmbbl") to 21.7 mmbbl; and having increased its total proved gas reserves 353% during fiscal 2011, from 39.45 mmbbl to 139.24 mmbbl.   Similar reports continued throughout the Class Period as Magnum Hunter conducted a purchasing spree whereby it acquired the assets of other companies using money it raised from offerings of its securities to unsuspecting investors.

4.      Given this context, the adequacy of the Company's internal and financial controls, particularly with respect to its accounting for reserves and acquisitions, was highly material to investors.   Throughout the Class Period, the Company repeatedly stated that its internal and financial controls were adequate and that its accounting was sound.   Such was not the case.   In fact, the Company lacked any real internal auditing staff and relied upon another publicly-traded energy company, of which Defendant Evans, Magnum Hunter's CEO, is the majority shareholder, to provide all of Magnum Hunter's internal auditing and accounting services. Indeed, while concomitantly serving as Magnum Hunter's top three executives, Defendants Evans, Ormand, and Krueger all also served, respectively, as Chairman of the Board of Directors/CEO, a director, and CFO of GreenHunter Energy, Inc. ("GreenHunter"), a company Defendant Evans founded before joining Magnum Hunter, which focuses on water resource management as it relates to the oil and gas industry.   During 2009, 2010, and most of 2011, GreenHunter had provided all of Magnum Hunter's internal accounting.   Magnum Hunter spent a total of $162,000, $212,000, and $30,000 for the years ended December 31, 2011, 2010, and 2009, respectively, for professional services provided by GreenHunter.

5.      According to the accounts of Plaintiffs' confidential witnesses, set forth below, Evans, Ormand, Krueger, Ferguson, and F. Smith were either aware of or recklessly disregarded

serious, material weaknesses in the Company's internal controls.  For example, during the Class Period, according to CW 1 and CW 2, the Company's accounting department was understaffed, lacked technical expertise, and failed to maintain even basic accounting controls such as separating the responsibilities for making journal entries and for posting them and adequately overseeing accounts payable.  Additionally, according to CW 1, CW 4, and CW 6, accounting for the Company's acquisition of NGAS Resources, Inc. ("NGAS") was handled by a single person who refused to let others review her work and was never audited.  Perhaps most shocking, beginning in at least September 2012 and particularly in December 2012, according to CW 3, Defendant Ferguson asked her to *change oil and gas production numbers to make "his numbers [] look good at the end of the year."*  And finally, by September 2012, according to CW 7, Defendant Kreuger was spending nearly the entirety of his time performing the accounting functions at GreenHunter, completely neglecting his duties at Magnum Hunter.  Despite these conditions at the Company, Evans, Ormand, Kreuger, Ferguson, and F. Smith continued to reiterate to investors that the Company's internal and financial controls were sound.

6.      Thus, Plaintiffs' Exchange Act claims arise out of a fraudulent course of business whereby the Company and the Exchange Act Individual Defendants made materially false and misleading omissions about the adequacy of Magnum Hunter's internal and financial controls and the reliability of Magnum Hunter's publicly-reported financial reports issued throughout the Class Period.  The Company's and Exchange Act Individual Defendants' omissions were revealed in the Company's April 16, 2013 announcement that the Company had dismissed its "independent" outside auditor, PricewaterhouseCoopers LLP ("PwC"), at the direction of the Audit Committee of the Company's Board of Directors, after PwC advised the Company of material weaknesses in the Company's internal accounting controls.  In so doing, the Company

and the Exchange Act Individual Defendants also disclosed that PwC had identified various issues that, if PwC had investigated, may have had a material impact on the fairness or reliability of Magnum Hunter's previously-reported consolidated financial reports, including: (1) valuation of the Company's oil and gas properties; (2) calculation of the Company's oil and gas reserves; (3) the Company's position with respect to certain tax matters; (4) the Company's accounting for its acquisition of NGAS; and (5) the Company's compliance with certain debt covenants. This was the second such purportedly "independent" auditor the Company had fired in connection with the fiscal 2012 audit, and this second firing rendered the Company unable to provide audited financial statements for fiscal 2012. After having filed multiple "corrections" to its filings made with the SEC during the Class Period; restating its second quarter 2012 financial results to increase its quarterly loss reported by nearly $4 million in October 2012 and disclosing (but intentionally downplaying) defects in its internal controls; taking an untimely $65 million impairment charge in December 2012; and nearly getting its stock delisted in January 2013 for failing to hold an annual shareholder meeting as required by state corporate law and the NYSE listing requirements, Magnum Hunter disclosed on April 16, 2013 that ongoing, pervasive defects in its internal controls over financial reporting and material weaknesses in its internal financial and tax reporting capacities remained, precluding the Company from timely reporting audited 2012 financial results and requiring that it obtain waivers from its lenders as to debt covenants.

7.      Upon the dissemination of this news, Magnum Hunter shares declined $0.49 per share, or 14.76%, to close at $2.83 per share on April 17, 2013, on unusually heavy trading volume.

8.      On April 22, 2013, Magnum Hunter disclosed that PwC disagreed with Magnum Hunter's description of their parting, releasing a letter from PwC, sent April 18, 2013,

stating that PwC did "not agree with the statements concerning" whether there had been any "reportable events" as defined in Item 304(a)(1)(v) of Regulation S-K under the Securities Act, relating to PwC's engagement as the Company's independent registered public accounting firm. PwC went on to state in the letter that PwC had "advised the Company that information [had come] to [its] attention that [PwC had] concluded materially impacts the fairness or reliability of the Company's consolidated financial statements and this issue was not resolved to [PwC's] satisfaction prior to [its] dismissal."

9.      Upon revelation of this disagreement, the Company's stock further declined, on usually high trading volume, to close at $2.50 per share.

10.     Throughout the Class Period, the Company and the Exchange Act Individual Defendants orchestrated a scheme to inflate the Company's share prices through a series of materially false and misleading omissions regarding the Company's internal and financial controls.  Specifically, the Company and the Exchange Act Individual Defendants failed to disclose: (1) that the Company lacked sufficient qualified personnel to design and manage an effective control environment; (2) that the Company had material weaknesses in, among other things, its financial reporting process,[1] accounting for its acquisition of NGAS, treatment of leasehold property costs, and tax accounting; (3) that, as a result, the Company lacked adequate internal and financial controls; and (4) that, as a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.  The Company and the Exchange Act Individual Defendants knew of or recklessly disregarded the material weaknesses in the Company's accounting system and the Company's lack of internal and financial controls.

11.     Defendants' wrongful acts and false and misleading omissions have caused a

---

[1] For example, there were material weaknesses in, among other processes: period-end financial reporting, consolidations, share-based compensation, acquisitions and divestitures, land and leasehold cost accounting, valuation of oil and gas properties, and calculation of oil and gas reserves.

precipitous decline in the market value of the Company's stock.  The price of Magnum Hunter stock, which had traded as high as $7.71 per share during the Class Period, plummeted more than 67% to close at $2.50 per share on April 22, 2013, erasing more than $878.5 million in market capitalization.  Plaintiffs and other Class members have suffered significant losses and damages as a consequence.

12.    Additionally, on May 11, 2012, while Magnum Hunter's stock price was artificially inflated, the Company, the Securities Act Individual Defendants, and the Underwriter Defendants orchestrated an Offering of 35,000,000 shares of the Company's common stock by means of additional false and misleading omissions of material facts about the Company's internal and financial controls, causing further losses to investors.

## II.    JURISDICTION AND VENUE

13.    This action arises under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5); and Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l and 77o).

14.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337; Section 27 of the Exchange Act (15 U.S.C. § 78aa); and Section 22 of the Securities Act (15 U.S.C. § 77v).

15.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b); Section 27 of the Exchange Act (15 U.S.C. § 78aa); and Section 22 of the Securities Act (15 U.S.C. § 77v).  The Company conducts business in this District and the alleged misconduct was transacted in and emanated from this District, including that:

- The Company's common stock and its other publicly-traded securities are listed and trade on the New York Stock Exchange ("NYSE");

- Many Class Period investor meetings and conferences were conducted in New York City, including the Company's April 17, 2013 "Business Update Call"

to discuss PwC's termination and related financial reporting issues; its presentation at the April 16, 2013 IPAA Oil & Gas Investment Symposium; and its presentation at the April 17, 2012 IPAA Oil & Gas Investment Symposium; and

- The Underwriter Defendants are all either headquartered in New York City or have substantial operations here and conducted the Offering and the accompanying road shows largely from New York City.

16.     In connection with the acts, conduct, and omissions alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities markets.

## III.     PARTIES

17.     Lead Plaintiff **Edward Paige**, as set forth in his certification attached hereto, purchased publicly-traded Magnum Hunter common stock at artificially-inflated prices during the Class Period and has been damaged thereby.

18.     Plaintiff **Delaware County Employees Retirement Fund**, as set forth in its certification attached hereto, purchased publicly-traded Magnum Hunter common stock at artificially-inflated prices during the Class Period and in the Offering and has been damaged thereby.

19.     Plaintiff **Mark Hinnau**, as set forth in his certification attached hereto, purchased publicly-traded Magnum Hunter 10.25% Series C Cumulative Perpetual Preferred Stock at artificially-inflated priced during the Class Period and has been damaged thereby.

20.     Plaintiff **Mike Gretschel**, as set forth in his certification attached hereto, purchased publicly-traded Magnum Hunter 8.0% Series D Cumulative Preferred Stock at artificially-inflated priced during the Class Period and has been damaged thereby.

21.     Defendant **Magnum Hunter Resources Corporation** is a Houston, Texas-based

independent oil and gas exploration and production company.  The Company operates in the United States and Canada and, as of February 2012, its oil-producing properties consisted of Eagle Ford Shale Properties located in Texas; Williston Basin Properties in North Dakota; Williston Hunter Canada Properties in Alberta, Canada; Tableland Properties in Saskatchewan, Canada; additional Alberta Properties; North Dakota Legacy Properties; Appalachian Basin Properties located primarily in New York, Pennsylvania, Ohio and West Virginia; Southern Appalachian Basin Properties located in Kentucky, Arkansas, Oklahoma, West Virginia and Virginia; South Louisiana/East Chalkley field in Louisiana; and other Texas and Louisiana Assets located in Colorado, Texas and Louisiana; and among other gas gathering and processing properties, its Eureka Hunter Pipeline System located in West Virginia and Ohio.  Magnum Hunter was formerly listed on the NYSE as Petro Resources Corporation, but changed its name to Magnum Hunter Resources Corporation in 2009 when its current management team took over.  The Company's common stock is now listed on the NYSE, an efficient market, under the ticker symbol "MHR" and, as of November 13, 2012, the Company had 168.6+ million shares outstanding.  As of January 2012, Magnum Hunter had three different types of securities registered under Section 12(b) of the Securities Act:  its common stock listed and traded on the NYSE; its 10.25% Series C Cumulative Perpetual Preferred Stock listed and traded on the NYSE-AMEX;  and  its  8.0% Series D Cumulative Preferred Stock listed and traded on the NYSE-AMEX.

22.     Defendant **Gary C. Evans** was, at all relevant times, Chairman of the Board of Directors and CEO of the Company, assuming his current role in July 2009.  Defendant Evans founded GreenHunter, a company focused on total water management solutions for oil and gas operators active in the Marcellus, Eagle Ford,  and  Bakken shale plays. During  2009,

9

2010, and most of 2011, GreenHunter provided all of Magnum Hunter's internal accounting. Defendant Evans serves as Chairman of the Board of Directors and CEO of GreenHunter. Defendant Evans owns 60% of GreenHunter's common stock.   During the Class Period, Defendant Evans sold 325,000 of his personally held Magnum Hunter common stock, reaping proceeds of $1,318,975.00.   Defendant Evans signed the false and misleading Registration Statement for the Company's May 11, 2012 Offering, as set forth below.

23.     Evans knew that the internal financial and accounting controls and expertise of the Company were severely deficient throughout the Class Period.   Yet Evans had personal financial incentives to conceal these deficiencies from the market, omit the true state of the Company's internal controls, and preserve the *status quo* of Magnum Hunter's inadequate controls: Evans had been borrowing heavily against the value of his Magnum Hunter stock holdings and using Magnum Hunter common stock as collateral, while pledging Magnum Hunter stock to at least three different creditors.   From at least 2009 through 2012, the higher Magnum Hunter's stock price, the more access Evans had to cash and credit to service his debts. Indeed, during litigation lasting from 2009 to 2012, Evans admitted in a court filing that he owned *no assets of material value* other than his Magnum Hunter stock.   Thus, maintaining Magnum Hunter's artificially inflated stock price was crucial to Evans' access to borrowing and liquidity.

24.     In 2009, for example, one of Evans' many creditors, The Frost National Bank (the "Bank"), sued Evans for defaulting on a multimillion dollar loan guaranty in an action titled *The Frost National Bank vs. Investment Hunter, LLC, et al*., Case No. DC-09-15818 (Tex. Dist. Ct., Dallas Cty.).   According to the Bank, Evans went to considerable lengths to fraudulently transfer and conceal thousands of unencumbered shares of Magnum Hunter common stock in

order to contravene court orders requiring him to disclose his assets and pay this creditor. In an effort to avoid being held in criminal contempt, Evans sold 325,000 shares of Magnum Hunter common stock in June 2012, and collected $1,318,750 to pay the Bank's judgment.

25.    Defendant **Ronald D. Ormand** was, at all relevant times, Executive Vice President and CFO of the Company, assuming this role in July 2009. Defendant Ormand also serves as a director of GreenHunter. Defendant Ormand signed the false and misleading Registration Statement for the Company's May 11, 2012 Offering, as set forth below.

26.    Defendant **David S. Krueger** served as Senior Vice President and CAO of Magnum Hunter from the start of the Class Period through October 2011. Defendant Krueger additionally serves as GreenHunter's CFO. During the Class Period, Defendant Krueger sold 172,500 of his personally held Magnum Hunter common stock, reaping proceeds of $645,150. Defendant Krueger signed the false and misleading Registration Statement for the Company's May 11, 2012 Offering, as set forth below.

27.    Defendant **H.C. "Kip" Ferguson, III**, has been Executive Vice President of Exploration since September 2009 as a result of Magnum Hunter's acquisition of Sharon Resources. In or around May 2011, Defendant Ferguson was appointed president of Eagle Ford Shale Division, which was renamed Eagle Ford Hunter Inc. In April 2013, Magnum Hunter monetized its core properties in the oil window of the Eagle Ford Shale in Gonzales and Lavaca Counties in South Texas through a sale of these properties to an affiliate of Penn Virginia Corporation.

28.    Defendant **Fred J. Smith, Jr.** was Senior Vice President and CAO of the Company from October 2012 until September 2013. Defendant F. Smith stated in his *curriculum vitae*, which he published on LinkedIn.com, that he was hired at Magnum Hunter to

11

rehabilitate its accounting department.  Indeed, F. Smith stated that, at the time of his arrival in October 2012, there already existed various ongoing accounting weaknesses at Magnum Hunter. Specifically, F. Smith stated on LinkedIn.com that he:

> Joined Magnum Hunter Resources in order to buildout the needed accounting staff resources to meet the demands of the prior years' merger activity. ***Inherited various accounting issues including a required 10-Q restatement and multiple material internal control weakness[es] environment.*** Successfully reconstructed the accounting function enabling the final completion of their 2012 audit and SEC filings. All SEC filings were brought current within a ninety day period after the replacement of the audit firm and the next quarterly filing was made timely. ***Planned for the complete replacement of all accounting and support information systems*** and installed a big four SOX and internal audit outsourced environment to redesign the internal and SOX control structure and remediate all material weaknesses and control deficiencies noted by auditors and internal staff.

29.     Defendants Evans, Ormand, Kreuger, Ferguson, and F. Smith are collectively referred to herein as the "Exchange Act Individual Defendants."

30.     During the Class Period, the Exchange Act Individual Defendants, as senior executive officers and/or directors of Magnum Hunter, were privy to confidential, proprietary and material adverse non-public information concerning Magnum Hunter and its operations, finances, financial condition and present and future business prospects via access to internal corporate documents; conversations and connections with other corporate officers and employees; attendance at management and/or board of directors meetings and committees thereof; and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Exchange Act Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

31.     The Exchange Act Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Exchange Act Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within

the meaning of Section 20(a) of the Exchange Act, and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.   Because of their positions of control, the Exchange Act Individual Defendants were able to and did, directly or indirectly, control the conduct of Magnum Hunter's business.

32.    The Exchange Act Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and money and portfolio managers and, through them, to the investing public.  The Exchange Act Individual Defendants were provided with copies of the Company's reports and publicly disseminated documents alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Exchange Act Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

33.    As senior executive officers and/or directors and as controlling persons of a publicly-traded company whose securities were, and are, registered with the SEC pursuant to the Securities Act and governed by the federal securities laws, the Exchange Act Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to Magnum Hunter's internal and financial controls, to correct any previously issued statements that had become materially misleading or untrue, so the market price of Magnum Hunter's securities would be based on truthful and accurate information.  The Exchange Act Individual Defendants' omissions during the Class Period violated these specific requirements and obligations.

34.    The Exchange Act Individual Defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of

Magnum Hunter's publicly-traded securities by concealing material adverse facts.

35.     Defendant **J. Raleigh Bailes, Sr.** was a member of Magnum Hunter's Board of Directors during the Class Period and signed the false and misleading Registration Statement for the Company's May 11, 2012 Offering, as set forth below.

36.     Defendant **Victor G. Carillo** was a member of Magnum Hunter's Board of Directors during the Class Period and signed the false and misleading Registration Statement for the Company's May 11, 2012 Offering, as set forth below.

37.     Defendant **Brad Bynum** was a member of Magnum Hunter's Board of Directors during the Class Period and signed the false and misleading Registration Statement for the Company's May 11, 2012 Offering, as set forth below.

38.     Defendant **Stephen C. Hurley** was a member of Magnum Hunter's Board of Directors during the Class Period and signed the false and misleading Registration Statement for the Company's May 11, 2012 Offering, as set forth below.

39.     Defendant **Joe L. McClaugherty** was a member of Magnum Hunter's Board of Directors during the Class Period and signed the false and misleading Registration Statement for the Company's May 11, 2012 Offering, as set forth below.

40.     Defendant **Steven A. Pfeifer** was a member of Magnum Hunter's Board of Directors during the Class Period and signed the false and misleading Registration Statement for the Company's May 11, 2012 Offering, as set forth below.

41.     Defendant **Jeff Swanson** was a member of Magnum Hunter's Board of Directors during the Class Period and signed the false and misleading Registration Statement for the Company's May 11, 2012 Offering, as set forth below.

42.     Defendants Evans, Ormand, Krueger, Bailes, Carillo, Bynum, Hurley,

McClaugherty, Pfeifer, and Swanson are collectively referred to herein as the "Securities Act Individual Defendants."

43.     The Securities Act Individual Defendants are strictly liable for false statements made in the Offering Documents filed with the SEC, as described below.  By virtue of signing the false and misleading Offering Documents for the Offering, the Securities Act Individual Defendants had the ability and opportunity to prevent their issuance or cause them to be corrected.

44.     Defendant **Credit Suisse Securities (USA) LLC** ("Credit Suisse"), a Joint Global Coordinator and Joint Book-Running Manager for the Offering, acted as an underwriter for shares issued pursuant to the false and misleading Registration Statement, set forth below, within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11), and drafted and disseminated the prospectus supplement pursuant to which shares were sold to Plaintiffs and/or members of the Class.

45.     Defendant **Citigroup Global Markets Inc.** ("Citigroup"), a Joint Global Coordinator and Joint Book-Running Manager for the Offering, acted as an underwriter for shares issued pursuant to the false and misleading Registration Statement, set forth below, within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11), and drafted and disseminated the prospectus supplement pursuant to which shares were sold to Plaintiffs and/or members of the Class.

46.     Defendants Credit Suisse and Citigroup are referred to herein as the "Underwriter Defendants."

47.     All defendants are collectively referred to herein as "Defendants."

## IV.    CONFIDENTIAL WITNESSES

48.     **Confidential Witness No. 1 ("CW 1")** joined Magnum Hunter as a contract

employee in the Company's accounting department in August 2011.  He was hired as a full-time accounting manager in February 2012 and remained at the Company until he left in August 2012.  CW 1 reported to Derek Smith ("D. Smith"), the Corporate Controller; D. Smith reported to Defendant Krueger.  CW 1 was responsible for accounting related to accounts payable and the Company's joint ventures and regularly interacted with the Company's outside auditors, initially Hein & Associates and then PwC.  He supervised nine of the twenty employees in the Company's accounting department, whose primary responsibilities were reconciling bank statements, adjusting journal entries, and working on joint interest billing ("JIB").  CW 1 has worked as an accountant in the gas and oil industry for over 25 years.

49.     CW 1 stated that D. Smith was responsible for hiring him.  D. Smith only had six months' of Controller experience, according to CW 1, and did not communicate effectively with his staff.  CW 1 said that D. Smith wanted everything done his way and would not take advice.  One example was in the hiring of CW 1's subordinates.  CW 1 stated that a big problem in the accounting department was lack of experience.  According to CW 1, the market rate for a JIB accountant with three years or less of oil experience was $60,000.  If the accountant had more than three years' experience the salary was around $72,000.  CW 1 stated that D. Smith would hire accountants with less experience so that the Company would not have to pay them more money.  D. Smith would not listen to CW 1's advice to pay more money to hire experienced accountants.  CW 1 stated that all of the accountants hired were competent but because of lack of experience they were not accustomed to terminology used in the gas and oil industry which would lead to mistakes.

50.     While he was an accounting manager at the Company, CW 1 identified problems with the Company's internal controls and brought them to D. Smith's attention.  One of the

issues that concerned CW 1 was that the Company allowed accountants who were providing journal entries to post them as well.  CW 1 felt that the Company should have had "another set of eyes" on the journal entries.  Another issue CW 1 identified was that Mandy Pettus, a staff accountant, was making decisions related to payables even through her job description was that she was solely responsible for cutting checks. CW 1 felt that someone else should have been reviewing accounts payable, and Pettus agreed and acknowledged there was no oversight.  When CW 1 brought both internal control issues to D. Smith's attention, D. Smith responded that he would "look into them," but never followed up.  CW 1 further noted that during his tenure at Magnum Hunter, the Company lacked an in-house internal audit function.

51.     CW 1 described accounting for the Company's acquisition of NGAS as "problematic."  CW 1 stated that this accounting was handled by one person, Sandy Owens, who was always very far behind and no one was allowed to review her work.  CW 1 reported that he found it "suspicious" that Owens would not allow anyone to review the NGAS accounting.  According to CW 1, internally at the Company everyone knew that Owens was the only person who had knowledge of the NGAS accounting.

52.     CW 1 ultimately resigned from Magnum Hunter.  It was his belief that some executives felt he was "asking too many questions" about the Company's procedures.  CW 1 stated that he did not understand how the Company could have procedures in place but not follow them.  CW 1 expressed concerns, in particular, about the Company's JIB accounting. CW 1 stated that for every joint partner, the Company's Land Group would communicate the appropriate joint interest partnership percentage to CW 1's group.  There were instances where the Land Group identified that there should be a correction/adjustment to the joint interest partner percentage and they communicated this to CW 1's group (*e.g.*, joint interest partner

owned 5% instead of 1%).  When there was a change in the joint interest percentage, D. Smith or those working for D. Smith would *manually* calculate an adjustment to determine the additional amounts that were owed by the joint interest partner.  CW 1 stated that this manual adjustment process made the reconciliation of the amounts owed by the joint interest partner difficult.  CW 1 indicated that instead of requiring manual adjustments he (or someone in his group) could have created "decks" in the system that would have effectively, more easily, and retroactively applied the new interest percentage which would not have required any manual adjustments.

53.     According to CW 1, if the Company's accounting staff had been allowed to make adjustments in the system via creating new decks then the joint interest partners would have seen on their invoices that the old charges were backed out and the new charges were applied. In his view, these new decks would have resolved any billing/invoicing issues and were preferable to a very difficult manual process.  According to CW 1, D. Smith was looking for a "quick fix" instead of fixing the joint interest partner's percentage in the system the way the Company should have done.  CW 1 indicated that D. Smith's manual process was not accurate because it did not go back to the initial point of drilling.  CW 1 had numerous discussions with D. Smith regarding the very onerous manual true-up process that D. Smith had instituted and provided an alternative way to correct invoicing issues yet he received no cooperation from D. Smith and D. Smith overrode any suggestions that CW 1 had.  CW 1 believes D. Smith just wanted it done his way.

54.     Under the JIB system as it was, CW 1 stated that "we were hitting our heads against a wall" because the information was "changing quite often."  "It was very frustrating." CW 1 stated that "there was no cooperation and no direction."  In fact, he said, there were a

couple of times that invoices were paid twice because the way accounting was done. CW 1 said he complained to D. Smith about these accounting practices during the summer of 2012, but that his suggestions and advice on these and other matters was ignored. CW 1 believed that management (including D. Smith) chose to close its eyes rather than know what was actually happening. According to CW 1, no one at the Company wanted to take ownership and no one wanted to be accountable. CW 1 stated that D. Smith was "very confused and very hard to deal with, because he was [a] 'revenue' and not [a] 'journal entries'"-trained person.

55. **Confidential Witness No. 2 ("CW 2")** worked for Magnum Hunter from approximately January 2011 through June 2013. CW 2's responsibilities included assisting in the preparation of all of the Company's financial reports for the January 2011 through June 2013 time period. CW 2 has an audit background and worked at Hein & Associates from 2005 through 2007.

56. According to CW 2, PwC did not agree with certain aspects of the valuation method Magnum Hunter used to determine unproved and proved oil and gas reserves and had suggested an alternative method. CW 2 stated that the Company's senior management did not agree with the alternative valuation method suggested by PwC.

57. According to CW 2, PwC could not find sufficient support and documentation for the property owned by Magnum Hunter. This issue came to light during the detailed test work PwC conducted as part of its audit, and most acutely became a problem about four to six weeks prior to PwC's termination of its audit at Magnum Hunter in April 2013. CW 2 explained that the documentation did not necessarily agree or was not sufficiently supported in the Magnum Hunter accounting system to show ownership of the land or drilling rights. According to CW 2, Magnum Hunter replaced PwC both because of the disagreement about the correct valuation

19

method and because Magnum Hunter could not provide the documentation that PwC was requesting within the timeframe needed to make its required financial reports.

58.     CW 2 stated that the Company's internal control weaknesses were due to, among other things, significant understaffing in the accounting department relative to the amount of growth the Company was experiencing.  According to CW 2, D. Smith left Magnum Hunter because of the stress caused by the significant understaffing of the accounting department.  CW 2 stated, "[T]he whole time I was there, we were understaffed.  … [I]t seemed common that things would be filed late because a lot of people had to do a lot of things. … "I don't feel like we ever caught up."  This chronic understaffing persisted.  In fact, understaffing was so bad that, according to CW 2, when Magnum Hunter brought in F. Smith in October 2012, CW 2 stated that it was "immediately" apparent to F. Smith that Magnum Hunter "need[ed] more people."

59.     **Confidential Witness No. 3 ("CW 3")** was an engineering technician who worked at Magnum Hunter from September 2012 to May 2013, when she was transferred to another company after a buyout.   While at Magnum Hunter, CW 3 reported directly to Defendant Ferguson.  Her responsibilities at the Company included maintaining daily oil and gas production quantities and integrating them into corresponding graphs and forecasts; developing monthly variance and cash flow reports, comparing and reviewing crude oil haul numbers, and providing them to the accounting department for evaluation; and evaluating daily production to determine well integrity as well as low-output wells.

60.     CW 3 stated that between four and five companies picked up Magnum Hunter's oil in the fields: "[T]he trucks would go out and pick up the oil, and put out run statements to show how much oil they picked up and how much they were paying us for it."  According to CW 3, however, Ferguson "would have me change the production numbers" of the barrels

produced by a well.  When asked how long his requests and her changing of the numbers went on, CW 3 stated that it happened "pretty much the whole time I worked there, [and] more towards the end of the year."  CW 3 further stated further that it occurred between September 2012 and May 2013, but in "December it would happen the most."  Alteration of the numbers "would go both ways.  Sometimes [the run statement] would say 500 barrels and [Ferguson] would 'up it to 1,000 but sometimes it would say 500 and he would decrease to 300 barrels."  CW 3 would enter the numbers into an Excel spreadsheet and then make graphs and other illustrative materials that gauged the levels of production among the wells.

61.     According to CW 3, Ferguson would increase the production numbers when a well started producing; and then as production slowed, he would lower the numbers at which the well was actually producing.  CW 3 said she asked Ferguson why she should change the numbers.  CW 3 explained that "[Magnum Hunter] had a contract company that did all of the numbers" and would actually read the field gauges and supply CW 3 with a gauge report.  But Ferguson would say "I already talked to the pumper," or "I already talked to the foreman," and tell CW 3 "to change it, saying he knows it's a certain number."  "Two or three times a week Ferguson asked to change numbers in December," CW 3 said.  "Basically, he wanted his numbers to look good at the end of the year."  CW 3 stated that, in or around January or February 2013, CW 3 raised the issue of Ferguson's fabrication of production numbers with Sylvia Norberg, a Land Administrator.  Norberg told CW 3 that Norberg and Brian Burgher, Senior Vice President of Land, were suspicious of Defendant Ferguson's conduct concerning oil production amounts and were already in the midst of looking further into Defendant Ferguson's practices, but that Norberg could not say more.

62.     **Confidential Witness No. 4 ("CW 4")** was a staff accountant who worked at

Magnum Hunter from July 2011 until July 2012.  CW 4 reported to D. Smith.  Her duties included doing "accruals" and day-to-day monthly journal entries for financial reporting.  CW 4 stated that internally in the Company's accounting department, people "had very poor communication skills."  With respect to accounting for the NGAS acquisition, CW 4 stated that "the accounting was crazy and complicated and only one person ran it, and it wasn't being audited.  That's all I know."  CW 4 said this was because Owens, the person who ran the NGAS accounting, was so secretive.  "The whole accounting situation was weird," CW 4 stated, "and [Owens] didn't want anyone else touching it and no one was supposed to touch it."  According to CW 4, "there were no internal controls on [the accounting for] NGAS."

63.     **Confidential Witness No. 5 ("CW 5")** was a Senior JIB Accountant at Magnum Hunter from May 2011 until April 2013.  To perform her duties as a joint interest accountant, CW 5 depended on the Land Group to provide her with important documentation from the oil-drilling projects the Company shared with other interest-holders.  These documents included the "JOAs" (joint agreements outlining the payout structures and specificities of the agreements) and the "DOIs" (divisions of interest among the companies involved).  Throughout her tenure at the Company, however, CW 5 stated that she was never provided with the JOAs, and thus was never certain the figures pertaining to the details of the joint-interest projects (and coding related to financial transactions) were correct.

64.     Of particular concern to CW 5 was recording the prepayments from interest owners (to assist with operating costs).  These prepayments were recorded as advances in the general ledger.  According to CW 5, commingled with this advance account were the amounts that Magnum Hunter owed to other companies for its investment interest in that entity.  CW 5 indicated that because the Company commingled these transactions it was hard to reconcile her

advance account.  CW 5 indicated that upon instruction from D. Smith, several individuals who worked for D. Smith would make journal entries to move the funds from the advance account to various other accounts.  CW 5 did not know what accounts funds were moved to or why these entries were made, but it made her job difficult.  CW 5 ultimately realized that she would have to start tracking this information on her own spreadsheet/ document since the advance account on the general ledger was unreliable and not accurate.  According to CW 5, this practice went on for about 1.5 years until it was cleared up by PwC during PwC's audit.  PwC agreed the practice was "totally wrong" and "corrected the errors."  PwC had tried to reconcile the account, but concluded that "it was impossible."  CW 5 stated that D. Smith was "in over his head" in terms of understanding oil/gas accounting.

65.     **Confidential Witness No. 6 ("CW 6")** was a Senior Accountant at the Company from August 2011 through July 2012.  He reported to D. Smith.  According to CW 6, he was responsible for doing reconciliations for the Company's 10Ks and 10Qs as well as maintaining the Company's general ledgers.

66.     With regard to accounting for the NGAS acquisition, CW 6 stated that Owens, the person in charge of the accounting, was Controller of NGAS prior to Magnum Hunter's acquisition of NGAS.  CW 6 confirmed that Owens was very territorial when it came to the accounting related to NGAS and would not let others at the Company get involved with it even after the acquisition.  CW 6 stated that the problem with the accounting for the NGAS acquisition was the lack of "technical expertise."  CW 6 stated that Owens was not accustomed to the fast-paced accounting that is expected at a public company.  He further stated that Owens behaved as if she worked at a private oil and gas company, and was concerned only with "what's in the bank and can we make payroll."

67.     **Confidential Witness No. 7 ("CW 7")** was Manager of Financial Reporting at GreenHunter Energy from September 2012 until October 2013.  CW 7 stated that when he arrived at GreenHunter in September 2012, Defendant Kreuger (who was CFO of GreenHunter in addition to being CAO of Magnum Hunter) worked extremely long hours at GreenHunter. According to CW 7, Kreuger was in the GreenHunter office every day and was handling accounting responsibilities typically conducted by much lower-level accounting staff, such as accruals and calculation of reserves.

68.     **Confidential Witness No. 8 ("CW 8")** was Financial Reporting Manager at Magnum Hunter from January 2013 until September 2013.  CW 8 was responsible for filing Forms 10-K and related documents with the SEC.  She also worked on internal audits with PwC. CW 8 stated that capital structuring and acquisitions were two accounting activities that the Company just "didn't hire enough people to manage."  The problem, according to CW 8, was that "you cannot grow at Magnum's speed without upgrading personnel, technology, and management," which Magnum failed to timely do.  This was a problem for PwC, she said, because the Company would rush into acquisitions and projects with the attitude, "you figure it out, PwC."  CW 8 said the Company would "fly by the seat of [its] pants and then expect PwC to figure it out."

69.     **Confidential Witness No. 9 ("CW 9")** worked as an accountant for GreenHunter from 2008 until June 2010 in the accounts payable department.  CW 9 reported to David Kreuger.  Around the time of January 2010, CW 9 was assigned to do invoice work for Magnum Hunter.  According to CW 9, Evans, while CEO of Magnum Hunter, had founded GreenHunter, but GreenHunter had not succeeded as expected.  As such, Evans returned to doing work for Magnum Hunter, and GreenHunter employees performed services provided to

Magnum Hunter.  Yet by January 2010, GreenHunter's own accounting department had been downsized to only three employees, not including David Kreuger.  Despite the thin staffing, GreenHunter employees provided accounting services to Magnum Hunter.  As part of this process, CW 9 dealt with invoices for Magnum Hunter and entered figures into OGsys, an accounting software program designed specifically for oil and gas projects.  Yet, despite having approximately seven years' training in accounts payable by this point in time, CW 9 stated that CW 9 did not understand the work that was required of CW 9 for the Magnum Hunter invoices.  The skill required was not a matter of experience; rather, gas and oil invoicing was a specialized process.  However, CW 9 was not given any new training for this new type of invoicing.  CW 9 stated that GreenHunter supervising staff, including Kreuger, "did not want to take the time" to train GreenHunter accountants how to process oil and gas invoices – not even training for complex JIB accounting.  In fact, according to CW 9, "that was their mentality: they just wanted you to do the work, they didn't necessarily want to train you or take the time."

## V.   EXCHANGE ACT CLAIMS

### A.   False and Misleading Omissions

70.     On January 17, 2012, the Company issued a press release entitled, "Magnum Hunter Announces Year-End 2011 Total Proved Oil & Gas Reserves 44.9 Million Barrels of Oil Equivalent; Proved Reserves Up 235% From Year-End 2010; Present Value (PV 10) Up 254% From Year-End 2010; Company Wide Resource Potential Exceeds 537.9 Million Barrels of Oil Equivalent."   The press release included the following statements:

> [Magnum Hunter] announced today a 235% increase in the quantity of the Company's estimated total proved reserves at December 31, 2011 as compared to December 31, 2010.  The present value of estimated future cash flows, before income taxes, of the Company's estimated total proved reserves as of year-end 2011, discounted at 10% ("PV-10"), also increased 254% as compared to twelve months ago at year-end 2010.

Magnum Hunter's total proved reserves increased by 31.5 million barrels of oil equivalent (Boe) to 44.9 million Boe (48% crude oil & ngl; 50.9% proved developed producing) as of December 31, 2011 as compared to 13.4 million Boe (51% crude oil & ngl; 44% proved developed producing) at December 31, 2010. The Company's reserve life (R/P ratio) based on the previously announced year-end exit production rate of approximately 12,500 Boe per day was 9.8 years as of December 31, 2011.

The present value (PV-10) of the Company's proved reserves at December 31, 2011 increased by $452.5 million or 254% to $630.3 million from $178 million at December 31, 2010.

\* \* \*

The estimates of Magnum Hunter's total proved reserves as of December 31, 2010 and December 31, 2011 were prepared solely by the Company's third-party engineering consultants, Cawley Gillespie & Associates, Inc. and, for certain of the December 31, 2011 proved reserves, AJM Deloitte.

**Resource Potential**

The Company's internal engineering team has evaluated the resource potential of Magnum Hunter's existing undeveloped lease acreage position in our three unconventional shale plays. The undeveloped acreage evaluated includes 652,419 gross acres and 347,547 net acres to Magnum Hunter's ownership interest.

\* \* \*

**Drilling Locations**

Currently, the total number of new drilling locations in Magnum Hunter's inventory is approximately 4,100 of which 1,400 are identified net drilling locations in these three unconventional resource plays. The new unrisked resource potential of 537.9 million barrels of oil equivalent is approximately 51% crude oil and natural gas liquids[.]

**Management Comments**

Mr. Gary C. Evans, Chairman of the Board and Chief Executive Officer of Magnum Hunter, commented, "***The ability to book new proved reserves in our three unconventional resource plays continues to grow exponentially due to the success we have been experiencing with our new well drilling efforts. It is quite remarkable to have reserve growth of 8 Million BOE in just three months of activity (up from 37 Million BOE at September 30, 2011) all from the drill bit alone and within our capital budget parameters. This reserve growth sets us up for another borrowing base increase with our Senior Bank Group which is currently in process, and is indicative of why we were successful in achieving five separate borrowing base increases last year. Once approved, this will further increase our Company's overall liquidity. Based***

*upon performance seen just in the first couple of weeks of 2012, we anticipate a continuation of exceptional growth in production and proved reserves which should result in the additional booking of new proved undeveloped drilling locations.*"[2]

71. The statements in paragraph 70 above concerning the present value, or PV-10, of the Company's estimated total proved reserves at December 31, 2011 were false and misleading because, as the Company later admitted, they omitted to state that the PV-10 had been miscalculated. The Company and the Exchange Act Individual Defendants knew of or recklessly disregarded the false and misleading nature of these statements because, during the Class Period, according to CW 1 and CW 2, the Company's accounting department was understaffed, lacked technical expertise, and failed to maintain even basic accounting controls.

72. On January 18, 2012, Magnum Hunter's Registration Statement No. 333-174879 on Form S-3 (the "Registration Statement"), signed by Defendants Evans, Ormand, Krueger, Bailes, Carrillo, Bynum, Hurley, McClaugherty, Pfeifer, and Swanson, became effective.

73. Also on January 18, 2012, Magnum Hunter announced that it had entered into agreements to sell additional shares of its common stock and additional shares of its Series D Cumulative Preferred Stock.

74. The next day, on January 19, 2012, the Company filed two prospectus supplements offering the sale of up to ten million shares of its common stock and up to two million shares of the Company's Series D Cumulative Preferred Stock.

75. On January 30, 2012, the Company announced that its January 17, 2012 press release announcing the Company's estimated total proved reserves at year-end 2011 (the "Reserves Release") included miscalculations. The Company's 8-K filing stated that "[d]ue to a miscalculation by one of the Company's third-party engineering consultants, this present

---

[2] Unless otherwise indicated, all emphasis is added.

value, or PV-10, as reported in the Reserves Release, was incorrect.   The correct present value, or PV-10, of the Company's estimated total proved reserves at December 31, 2011 is $616.9 million, not $630.3 million, as reported in the Reserves Release."   The Company continued that the "miscalculation did not affect the amount of the Company's estimated total proved reserves at December 31, 2011 reported in the Reserves Release."

76.   On February 29, 2012, Magnum Hunter issued a press release announcing its fourth quarter and fiscal 2011 financial results for the interim period ending December 31, 2011, entitled, "Magnum Hunter Reports Financial Results for the Fourth Quarter of 2011 and Fiscal Year End 2011- Record EBITDAX and Cash Flow Reported; 2011 Production increased 324% from 2010; 2011 Revenues Increased 295% from 2010; 4th Quarter Avg. Daily Production Increased 73% from 3rd Quarter; Year-End 2012 Production Exit Rate Guidance Increased to 16,000 BOEPD."   Concerning Magnum Hunter's fourth quarter 2011 financial results, the press release stated that:  (i) the Company reported an increase in total revenues of 404% to $49.1 million for the three months ended December 31, 2011 compared to $9.7 million for the three months ended December 31, 2010; (ii) operating margins improved substantially as lease operating expenses per barrel of oil equivalent ("Boe") declined from $20.15 per Boe to $11.71 per Boe; (iii) there was a net loss of $60.9 million or ($0.46) per basic and diluted common shares outstanding for the three months ended December 31, 2011, compared to a net loss of $1.9 million, or ($0.03) per basic and diluted common shares outstanding for the three months ended December 31, 2010; and (iv) for the three months ended December 31, 2011, Magnum Hunter's 'Adjusted Earnings Before Interest, Income Taxes, Depreciation and Amortization' ("Adjusted EBITDA") was $21.2 million or $0.16 per basic and diluted common shares outstanding as compared to $0.9 million or $0.01 per basic and

diluted common shares outstanding for the three months ended December 31, 2010, representing an increase of 2,281%.  Regarding the financial results for fiscal 2011, the Company reported: (i) an increase in revenues of 295% to $129.2 million for the twelve months ended December 31, 2011 compared to $32.7 million for the twelve months ended December 31, 2010; (ii) a net loss of $90.7 million or ($0.80) per basic and diluted common shares outstanding for the twelve months ended December 31, 2011, compared to a net loss of $22.3 million, or ($0.25) per basic and diluted common shares outstanding during the twelve months ended December 31, 2010; and (iii) Adjusted EBITDA of $50.4 million or $0.45 per basic and diluted common shares outstanding as compared to $4.2 million or $0.07 per basic and diluted common shares outstanding for the prior fiscal year ended December 31, 2010, representing a 1,094% increase.   Regarding production results, the Company's "[a]verage daily production increased 547% for the three months ended December 31, 2011 to 9,124 barrels of oil equivalent per day"; thus, they expected "to exit 2012 in excess of 16,000 Boepd, with approximately 55% of the production mix being oil/liquids."  Defendant Evans commented in the press release that:

> Calendar year 2011 was a transitional period for Magnum Hunter.  During the first half of the year, we successfully closed on a number of acquisitions that provided the foundation from which we are growing our daily production and proved reserves today.  During the second half of the year, we completed the integration of approximately $590 million in transactions and began our "harvesting" mode of exploiting the tremendous leasehold acreage positions covering these unconventional resource plays.  Our year-end production success which is continuing into the first quarter of 2012, has given us the confidence to increase our projected exit rate on daily production a third time to 16,000 Boe per day by year-end.  At the same time, we continue reducing our cost structure both in the field and at our corporate offices which will enable us to report much wider margins of cash flow available for reinvestment.  Because we are in control of approximately 75% of our core properties as an operator, we have the flexibility to move our capital program around and reallocate among our two oil plays (Bakken and Eagle Ford) while the energy industry deals with an unprecedented glut of natural gas.  This will ensure that our returns on capital

deployed in 2012 remain at superior levels.  Our management team continues to make operating improvements in the field which is resulting in production levels that exceed our prior expectations.

77.     Also on February 29, 2012, the Company filed its Form 10-K for the fiscal year

ended December 31, 2011, signed by Defendants Evans, Ormand, and Kreuger.  In Item 9A of

the Form 10-K, the Company stated:

**Evaluation of Disclosure Controls and Procedures**

As of the end of the period covered by this report, an evaluation of the effectiveness of the design and operation of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) under the Exchange Act) was performed under the supervision and with the participation of the Company's management, including our Chief Executive Officer and Chief Financial Officer. Based on that evaluation, the Company's Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective as of December 31, 2011 to ensure:  that information required to be disclosed in the reports it files and submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms; and that information that is required to be disclosed under the Exchange Act is accumulated and communicated to the Company's management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

**Evaluation of Changes in Internal Control over Financial Reporting**

Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we have determined that, during the fourth quarter of fiscal 2011, there were no changes in our internal controls over financial reporting that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting.

**Management's Annual Report on Internal Controls Over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) of the Exchange Act. Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we assessed the effectiveness of our internal controls over financial reporting as of the end of the period covered by this report based on the framework in "Internal Control—Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission.  Based on that assessment, our Chief Executive Officer and Chief Financial Officer concluded that our internal controls over financial reporting were effective as of December 31, 2011 to provide

reasonable assurance regarding the reliability of our financial reporting and the preparation of our financial statements for external purposes in accordance with U.S. generally accepted accounting principles.

The Company acquired Williston Hunter Canada, Inc., Williston Hunter, Inc., and Magnum Hunter Production, Inc. during fiscal 2011.  As permitted by SEC guidance, management excluded the acquired companies from its assessment of the effectiveness of the Company's internal control over financial reporting as of December 31, 2011.  Williston Hunter Canada, Inc., Williston Hunter Inc., and Magnum Hunter Production, Inc. are wholly-owned subsidiaries whose total assets and net income represent approximately 34% and 35%, respectively, of the related consolidated financial statement amounts as of and for the year ended December 31, 2011.

The effectiveness of the Company's internal controls over financial reporting as of December 31, 2011, has been audited by Hein & Associates, LLP, an independent registered public accounting firm, as stated in their attestation report which is included in Item 8, "Financial Statements and Supplementary Data."

78.    The 2011 10-K was also certified by Defendants Evans and Ormand pursuant to

the Sarbanes-Oxley Act of 2002, attaching dual certificates stating each certified that:

1.    I have reviewed this annual report on Form 10-K of the Company;

2.    Based on my knowledge, *this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading* with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations  and cash flows of the registrant as of, and for, the periods presented in this report;

4.    *The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:*

a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)    *Designed such internal control over financial reporting, or caused such*

*internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;*

c)      *Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation;* and

d)      *Disclosed* in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) *that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.*

5.      The registrant's other certifying officer(s) and I *have disclosed*, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)      *All significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information;* and

b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

79.      The statements in paragraphs 77-78 above concerning the Company's internal and financial controls were false and misleading because they omitted to state (1) that the Company lacked sufficient qualified personnel to design and manage an effective control environment; (2) that the Company had material weaknesses in, among other things, its financial reporting process, accounting for its acquisition of NGAS, treatment of leasehold property costs, and tax accounting; (3) that, as a result, the Company lacked adequate internal and financial controls; and (4) that, as a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.   The Company and the Exchange Act Individual Defendants knew of or recklessly disregarded the material weaknesses in the Company's

accounting system and the Company's lack of internal and financial controls for the following reasons, among others:

a)      during the Class Period, according to CW 1 and CW 2, the Company's accounting department was understaffed, lacked technical expertise, and failed to maintain even basic accounting controls such as separating the responsibilities for providing journal entries and for posting them and adequately overseeing accounts payable;

b)      according to CW 1, CW 4, and CW 6, accounting for the Company's acquisition of NGAS was handled by a single person who refused to let others review her work and was never audited; and

c)      according to CW 1 and CW 5, shortcuts were taken in accounting for the Company's joint interest ventures which resulted in inaccurate billing.

80.      On March 30, 2012, Magnum Hunter closed its previously announced purchase of certain assets of Eagle Operating, Inc., a North Dakota corporation ("Eagle").  The assets included Eagle's operating working interest ownership in oil and gas leases and wells on approximately 15,500 gross acres located within four counties of the Williston Basin of North Dakota, related personal property and equipment, and Eagle's interest in certain oil and gas in storage.  The purchase price was approximately $53 million, $50.9 million of which was paid in cash, and the remainder was paid with 296,859 shares of Magnum Hunter restricted common stock valued at $6.74 per share, or $2 million.

81.      On May 3, 2012, Magnum Hunter issued a press release entitled "Magnum Hunter Reports Financial Results for the First Quarter of 2012 – Revenues Increased 293%; EBITDAX Increased 425%; Production increased 380%."   The press release stated, in pertinent part, as follows:

Mr. Gary C. Evans, Chairman of the Board and Chief Executive Officer of Magnum Hunter Resources, commented, "We are pleased to report our operating and financial results for the first quarter of 2012 improved on all counts. Management has positioned the Company with a portfolio of proved and unproved properties in three of the most exciting unconventional resource plays in the world today. As we continue to harvest these resources by prudently developing the assets in a manner that offers exceptional financial returns, our cash flow and income will reflect these accomplishments. We are fortunate that two of our shale plays are oil and we have the ability to shift our capital program around to take advantage of the huge disparity between oil and natural gas prices today. By completing the two acquisitions in Ohio and North Dakota during the first quarter, and with the pending Baytex acquisition in the amount of $311 million announced several weeks ago scheduled to close later this month, we are continuing to add prime lease acreage to our existing asset base. These assets will continue to provide drilling opportunities for many years to come. Well results in all three of our shale plays are outperforming our third party engineering production type curves which gives us increased confidence that proved reserves companywide continue to be understated."

82.     Also on May 3, 2012, the Company filed its Form 10-Q with the SEC for the interim financial period ended March 30, 2012, which further detailed the Company's first quarter financial results and was signed by Defendants Evans and Ormand (the "1Q 2012 10-Q").

83.     The Company's 1Q 2012 10-Q contained, in pertinent part, the following description of Magnum Hunter's disclosure controls and procedures:

**Evaluation of disclosure controls and procedures**

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in the reports we file under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Such controls include those designed to ensure that information for disclosure is accumulated and communicated to management, including the Chairman and the Chief Executive Officer ("CEO") and the Chief Financial Officer ("CFO"), as appropriate, to allow timely decisions regarding required disclosure.

Our management, with the participation of our CEO and CFO, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Exchange Act) as of March 31, 2012. Based on this evaluation, the CEO and CFO have concluded that, as of March 31, 2012, our

34

disclosure controls and procedures were effective to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is (1) recorded, processed, summarized and reported within the   time   periods specified in the SEC's rules and forms, and (2) accumulated and communicated to our management, including our CEO and CFO, as appropriate to allow timely decisions regarding required disclosure.

**Internal control over financial reporting**

There were no changes made in our internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) during the three months ended March 31, 2012, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

84.     The 1Q 2012 10-Q attached Sarbanes-Oxley certifications similar to those detailed in paragraph 78.

85.     The statements in paragraphs 83-84 above concerning the Company's internal and financial controls were false and misleading because they omitted to state (1) that the Company lacked sufficient qualified personnel to design and manage an effective control environment; (2) that the Company had material weaknesses in, among other things, its financial reporting process, accounting for its acquisition of NGAS, treatment of leasehold property costs, and tax accounting; (3) that, as a result, the Company lacked adequate internal and financial controls; and (4) that, as a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.   The Company and the Exchange Act Individual Defendants knew of or recklessly disregarded the material weaknesses in the Company's accounting system and the Company's lack of internal and financial controls for the following reasons, among others:

a)     during the Class Period, according to CW 1 and CW 2, the Company's accounting department was understaffed, lacked technical expertise, and failed to maintain even basic accounting controls such as separating the responsibilities for providing journal entries and for posting them and adequately overseeing accounts payable;

b)        according to CW 1, CW 4, and CW 6, accounting for the Company's acquisition of NGAS was handled by a single person who refused to let others review her work and was never audited; and

c)        according to CW 1 and CW 5, shortcuts were taken in accounting for the Company's joint interest ventures which resulted in inaccurate billing.

86.        Lastly, on May 3, 2012, the Company announced that it intended to offer $450 million in aggregate principal amount of senior notes due in 2020.  A concurrent public offering of 35,000,000 shares of Magnum Hunter's common stock (the "Offering") was also announced.  On May 11, 2012, it was announced that the shares offered in the Offering were being priced at $4.50 per share and the private notes offering at 98.646% of the principal amount.  On May 16, 2012, the Company completed both offerings.

87.        On June 1, 2012, the Company announced that although the Audit Committee of its Board had "initially selected and engaged Hein & Associates LLP ("Hein") as the Company's independent registered public accountants for fiscal 2012," the Board determined that the "Company needed a larger accounting firm with more depth in its professional expertise."   On July 17, 2012, PwC was hired as the Company's independent auditor for fiscal 2012.

88.        On July 16, 2012, Magnum Hunter issued a press release entitled "Magnum Hunter Resources Announces Mid-Year Total Proved Oil & Gas Reserves-Total Proved Reserves of 67.7 Million Barrels of Oil Equivalent; Proved Reserves Up 51% From Year-End 2011; Present Value (PV 10) Up 55% From Year-End 2011," which purported to detail the Company's estimated total proved reserves at June 30, 2012 and also provide an estimate of the resource potential associated with its existing undeveloped mineral lease acreage position in the

Company's four shale plays.

89.     On August 9, 2012, Magnum Hunter issued a press release entitled "Magnum Hunter Reports Financial Results for the Second Quarter of 2012 and Six Months Ended June 30, 2012 – Revenues Increased 104% to $60.3 Million; Pro Forma Adjusted EBITDA Record High of $41.1 Million for Second Quarter 2012; 162% Increase in Average Production Rate from Second Quarter of 2011; Borrowing Base Increased 22% from $212.5 Million to $260 Million."  The press release stated, in pertinent part, as follows:

> Mr. Gary C. Evans, Chairman of the Board and Chief Executive Officer of Magnum Hunter Resources, commented, "Financial results for the second quarter and first half of 2012 reflect consistent growth in production, revenues and cash flow.  At the same time, maintaining cost control has been paramount and our substantial reduction in lease operating expenses and general and administrative expenses per barrel of oil equivalent produced continues to decline.  This allows the cash margin expansion that we have been experiencing each quarter over the past year. Our leasehold acreage position in all five of our shale plays continues to expand, most notably in the Williston Basin and the Eagle Ford, our two oil plays.  As crude oil prices have moved back well north of $90.00 per barrel, we continue to increase our commodity hedge position to safe guard future volatility and insure cash flow down the road. With over $255 million of current and available liquidity, we are sufficiently funded to meet all our capital needs for the foreseeable future."

90.     Also on August 9, 2012, the Company filed its Form 10-Q with the SEC for the interim financial period ended June 30, 2012, which further detailed the Company's second quarter financial results and was signed by Defendants Evans and Ormand (the "2Q 2012 10-Q").  As to the Company's "Controls and Procedures," the 2Q 2012 10-Q made representations similar to those in the 1Q 2012 10-Q detailed in paragraph 83 and attached Sarbanes-Oxley certifications similar to those detailed in paragraph 78.

91.     The statements in paragraph 90 above concerning the Company's internal and financial controls were false and misleading because they omitted to state (1) that the Company lacked sufficient qualified personnel to design and manage an effective control environment;

(2) that the Company had material weaknesses in, among other things, its financial reporting process, accounting for its acquisition of NGAS, treatment of leasehold property costs, and tax accounting; (3) that, as a result, the Company lacked adequate internal and financial controls; and (4) that, as a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.  The Company and the Exchange Act Individual Defendants knew of or recklessly disregarded the material weaknesses in the Company's accounting system and the Company's lack of internal and financial controls for the following reasons, among others:

a)      during the Class Period, according to CW 1 and CW 2, the Company's accounting department was understaffed, lacked technical expertise, and failed to maintain even basic accounting controls such as separating the responsibilities for providing journal entries and for posting them and adequately overseeing accounts payable;

b)      according to CW 1, CW 4, and CW 6, accounting for the Company's acquisition of NGAS was handled by a single person who refused to let others review her work and was never audited; and

c)      according to CW 1 and CW 5, shortcuts were taken in accounting for the Company's joint interest ventures which resulted in inaccurate billing.

92.      On August 12, 2012, during a presentation to investors about its Q2 financial results and in specific reference to the Eagle Ford site, Defendant Ferguson told investors that:

> [S]ome of the wells that we have are even approaching 550 [Mboe] from internal estimates. We have some wells, ***they're clearly exceeding the Cawley Gillespie's decline curve***. So we're quite excited about it. We have like four or five of them actually that are exceeding that 450 ***decline curve that we are projecting***. But right now, I think, we're just going to stay with the 450 on our projections and what we kind of estimate going forward. And if we get better results, we'll probably announce them in December.

93.      The statements in paragraph 92 above, including the statement that wells were

exceeding the Cawley Gillespie (Magnum Hunter's third-party engineering consultants') decline curve as well as the expected imminent performance of other wells with regard to decline curves,[3] constituted materially false and misleading omissions and were designed to and in fact did falsely reassure investors that Magnum Hunter had achieved consistency as well as higher volumes in the production of its wells at the Eagle Ford site.  These statements were materially false and misleading because they failed to disclose that (1) the Company  had material weaknesses in, among other things, its valuation of its oil and gas properties and its calculation of oil and gas reserves; and (2) Ferguson was, in part, fabricating production numbers for the wells at the Eagle Ford site, including, according to CW 3, the manipulation of numbers to make relevant decline curves appear more stable and at higher production levels.

94. On September 7, 2012, Magnum Hunter announced that it had priced an underwritten public offering of 1,050,000 shares of 8.0% Series D Cumulative Preferred Stock (liquidation preference of $50.00 per share) at a public offering price of $44.00 per share, with the Company raising $46.2 million.

95. On October 22, 2012, the Company filed a Current Report on Form 8-K with the SEC wherein the Company stated, in relevant part, as follows:

> **Item 4.02.   Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**
>
> The following disclosure is made pursuant to part (a) of Item 4.02.
>
> On October 12, 2012, management of Magnum Hunter Resources Corporation (the "Company") *discovered an inadvertent error in the calculation of non-cash share-based compensation expense relating to common stock options granted to employees by the Compensation Committee during the second quarter of 2012 that affected certain items in the unaudited interim consolidated financial*

---

[3] "Decline curve analysis is a means of predicting future oil well or gas well production based on past production history. Production decline curve analysis is a traditional means of identifying well production problems and predicting well performance and life based on measured oil well production."  Decline Curve Analysis, http://en.wikipedia.org/wiki/Decline_curve_analysis.

statements (the "Financial Statements") contained in the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2012, as filed with the Securities and Exchange Commission (the "SEC") on August 9, 2012. The non-cash share-based compensation expense was inadvertently understated due to the misapplication of the vesting schedule of such options (specifically, not taking into account that 25% of such options were exercisable commencing on the date of grant thereof). **The error resulted in the understatement of non-cash share-based compensation expense of approximately $3.8 million.** The understatement of expense was discovered by management during implementation of a new software system intended to track stock-option related compensation expense. The new software system confirmed the accuracy of all other calculations in prior periods relating to this specific expense item.

On October 19, 2012, the Company's Audit Committee met to review the matter, and, after discussions with management, concluded that the Financial Statements should no longer be relied upon due to the adjustments required as a result of the calculation error and concurred with management's recommendations with respect to the implementation of additional procedures and controls designed to address the matter. Management of the Company and the Audit Committee discussed with both PricewaterhouseCoopers LLP, the Company's current independent registered public accounting firm, and Hein & Associates LLP, the Company's previous independent registered public accounting firm through the second quarter of 2012, the matters disclosed in this Form 8-K.

The Company will be filing an amendment to its second quarter ended June 30, 2012 Form 10-Q with the Securities and Exchange Commission.

Our management, including the CEO and CFO, has evaluated the effectiveness of our disclosure controls and procedures as of June 30, 2012. Based on this evaluation, management has concluded that our disclosure controls and procedures were not effective due to a material weakness in the accounting for share-based compensation expense. We did not effectively review supporting documentation for the journal entry for share-based compensation as necessary to properly state non-cash share-based compensation expense on the published financial statements of operations. **New procedures and controls are being implemented to ensure that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act of 1934 is (1) recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and (2) accumulated and communicated to our management, including our CEO and CFO, as appropriate to allow timely decisions regarding required disclosure.** The following are the principal items in the Financial Statements affected by the non-cash compensation expense understatement of $3.8 million:

- General and administrative expense for the three and six month periods ended June 30, 2012 should have been $16,440,000 and $31,639,000, respectively, rather than $12,592,000 and $27,791,000,

respectively, as previously reported.  This represents an increase of $3,848,000 or 30.6% and 13.9% for these periods, respectively.

- Net loss attributable to common shareholders for the three and six month periods ended June 30, 2012 should have been ($18,463,000) and ($35,515,000), respectively, rather than ($14,615,000) and ($31,667,000), respectively, as previously reported.  This represents an increase of $3,848,000 or 26.3% and 12.1% for these periods, respectively.

- Net loss per common share for the three and six month periods ended June 30, 2012 should have been ($0.12) and ($0.25), respectively, rather than ($0.10) and ($0.22), respectively, as previously reported.

These changes in general and administrative expense, net loss attributable to common shareholders and net loss per common share will be properly reflected in the Company's future filings with the Securities and Exchange Commission, as applicable, including an amendment to the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2012.  None of these changes has any effect on the Company's compliance with its existing debt covenants or in calculations of the Company's EBITDAX.

***In light of the material weakness in the accounting for share-based compensation expense, we have performed and implemented additional new procedures, which include the utilization of new and more experienced personnel to review share-based compensation expense and completing the implementation of software to track such expenses in order to further strengthen this internal control***.

96.     The statements in paragraph 95 above were designed to and in fact did falsely reassure investors that Magnum Hunter had both identified and corrected any defects in its internal controls, but in reality omitted to discuss the chronic, overarching internal control problems that existed and that were eventually disclosed in April 2013.

97.     On October 22, 2012, Senior Editor Scott Weeden quoted Defendant Ferguson's statements about the predictability of production levels from the Eagle Ford project in an article published for *E&P*.  As reported in "Guar Substitute Boosts Eagle Ford IPs By 20%," *E&P* (Oct. 22, 2012), *available at* http://www.epmag.com/Production-Completion/Guar-Substitute-Boosts-Eagle-Ford-IPs-20_108713, Ferguson stated:

41

One of the things about our area in the Eagle Ford is that *it is very predictable*. We generally know where our fluid is going to be, how many stages we have, how long our laterals are going to be, and what the I[nitial] P[roduction]s are going to be with the current guar gel systems.

In adding a PermStim system, we are able to document and figure out how much added advantage we get with clean fluid and less residual fluid…. *Bottom line, we added about a 20% increase over our average I[nitial] P[roduction] for our operated wells, which is amazing*. Today, we make about 7,000 b/d to 8,000 b/d. If you add just 20% to that, it is a significant enhancement of our income, internal rate of return, and the estimated ultimate recoveries for our wells.

It's about what these wells will become in the next five to 10 years and not just about what you get in the first 60 days or 90 days. We want to know how these incredible reserves in formations with very little natural permeability are going to be affected by the fluid we pump.

98.    On October 23, 2012, Magnum Hunter appointed Defendant F. Smith in Defendant Krueger's place as Senior Vice President of Accounting and CAO.

99.    On October 24, 2012, the Company issued a press release entitled "Magnum Hunter Provides Third Quarter 2012 Company Wide Operational Update."  In the press release, Ferguson stated to investors that:

The proved reserves from the Company's Eagle Ford division continues to grow and the individual well EURs [Estimated Ultimate Recovery] *have continued to increase over time with more production history. We believe this is a direct result of our careful on-target drilling execution and comprehensive completion process* with longer laterals and more frac stages allowing us to more effectively treat the lateral hole. Additionally, we are continuing to use electric submersible pumps as part of our reservoir monitoring solution, which allows us to more efficiently produce the wells. The goal is to continue to allow each well to produce 100,000 barrels of oil equivalent within the first 9-12 months of production, which we determine to be pay-out, with minimal bottom hole flowing pressure decline.

100.    The statements in paragraphs 97 and 99 above, including the October 22 statements about "predictable" conditions and a "20% increase over average" initial productions, as well as the October 24 statements regarding a "continued increase" in EURs and improvement in production numbers as a "direct result of our careful on-target drilling,"

constituted materially false and misleading omissions and were designed to and in fact did falsely reassure investors that Magnum Hunter had achieved consistency as well as higher volumes in the production of its wells at the Eagle Ford site.  These statements were materially false and misleading because they failed to disclose that (1) the Company  had material weaknesses in, among other things, its valuation of its oil and gas properties and its calculation of oil and gas reserves; and (2) Ferguson was, in part, fabricating production numbers for the wells at the Eagle Ford site.  According to CW 3, from at least September 2012 onward, Ferguson would consistently falsely inflate production numbers at the outset of a new well's production and then falsely lower the numbers when the well was tapering off because Ferguson "wanted his numbers to look good."

101.   On October 24, 2012, Magnum Hunter agreed to purchase all of the outstanding capital stock of Viking International Resources Co., Inc. for approximately $106.7 million, of which approximately $37.3 million would be payable in cash and approximately $69.4 million would be payable in the form of approximately 2,774,850 depositary shares representing 2,774.85 shares of a new 8.0% Series E Cumulative Convertible Preferred Stock of the Company that would be created and privately issued to consummate the sale.  On November 2, 2012, the closing of the purchase was consummated.

102.   On November 9, 2012, the Company filed a Notification of Late Filing with the SEC on Form 12b-25 wherein the Company stated, in relevant part, as follows:

> As reported under Item 4.02 of the Current Report on Form 8-K (the "Form 8-K") filed with the Securities and Exchange Commission on October 22, 2012 by Magnum Hunter Resources Corporation (the "Company"), the Company is in the process of restating its previously issued unaudited financial statements for the quarterly period ended June 30, 2012 included in its Quarterly Report on Form 10-Q (the "Restatement").  ***The Company is working diligently to complete the Restatement, evaluating identified control deficiencies and the closing and reporting process, including completing and providing the necessary***

*information to its newly appointed Independent Auditors for them to complete their review.  Therefore, the Company is unable to complete the Restatement process, evaluate its conclusions regarding internal controls, and file its Quarterly Report on Form 10-Q (the "Form 10-Q") for the period ended September 30, 2012 on or before the prescribed due date of November 9, 2012 without unreasonable effort or expense for the reasons described above*.

The Company anticipates that it will file the Quarterly Report no later than the fifth calendar day following the prescribed filing date.  We refer you to the Form 8-K for more information related to the Restatement, including, without limitation, the nature of the accounting error giving rise to the Restatement.

103.    Despite being unable to file a timely restatement of its 2Q 2012 10-Q, on November 13, 2012, Magnum Hunter issued a press release entitled "Magnum Hunter Reports Financial Results for the Third Quarter of 2012 and Nine Months Ended September 30, 2012 - Revenues Increased 149% to $69.8 Million; Borrowing Base Increased 44% from $260 Million to $375 Million; Current Net Production of 15,750 Boepd."  The press release stated, in pertinent part, as follows:

Mr. Gary C. Evans, Chairman of the Board and Chief Executive Officer of Magnum Hunter Resources, commented, "Our efforts to build the foundation necessary for a significant unconventional resource company continued during the third quarter of 2012.  Our production growth, reserve growth and resulting cash flow growth are further substantiated by the recent $115 million increase in the Company's bank borrowing capacity.  Our Appalachia Division has been crippled all year due to the combination of lower natural gas prices, limited midstream take away capacity, and no gas processing infrastructure for liquids extraction.   All of these issues have been worked on throughout the year and are close to being resolved, which now positions this division for explosive growth into next year.  The Company's Board of Directors and management recognize the huge disparity between our current equity valuation and our real asset value.  Since we are forced to operate in a "show-me" market as opposed to the historical "tell-me" market, we have taken the appropriate steps to begin realizing the true value of some of our unconventional assets.   Once realized, this will be a tremendous benefit for our long term and dedicated shareholders."

104.    On November 14, 2012, Magnum Hunter disclosed in a Current Report on Form 8-K that although the Company had failed to hold an annual meeting of shareholders since October 27, 2010, and had already pushed out the date of the 2012 annual meeting of

shareholders several times during fiscal 2012 (having apparently skipped its fiscal 2011 annual meeting of shareholders altogether), the Company was again pushing out the 2012 annual meeting of shareholders then scheduled for December 20, 2012 into January 2013.   The Company's Form 8-K explained that, "[o]n November 2, 2012, the SEC notified the Company that the SEC will be reviewing the Company's Preliminary Proxy Statement, which was filed with the SEC on October 26, 2012[,]" and that "[t]he Company [would] address the SEC's comments to the Preliminary Proxy Statement, if any, once received."

105.    Also on November 14, 2012, Magnum Hunter filed its restated 2Q 2012 10-Q, signed by Defendants Evans, Ormand, and F. Smith, which addressed the previously-reported restatement, substantially increased the scope of the restatement in the 2Q 2012 10-Q, and purported to describe the Company's then-present internal controls:

> Item  4. Controls and procedures.
>
> **Restatement of Previously Issued Financial Statements**
>
> On October 12, 2012, management ("we") of Magnum Hunter Resources Corporation (the "Company") identified an error in the calculation of non-cash share-based compensation expense relating to common stock options granted to employees by the Compensation Committee during the second quarter of fiscal year 2012.  The non-cash share-based compensation expense was understated due to the misapplication of the vesting schedule of such options (specifically, the Company's calculations did not take into account that 25% of such options were immediately exercisable on the date of grant).  The error affected our previously issued financial statements contained in the Company's Quarterly Report on Form 10-Q, as filed with the Securities and Exchange Commission ("SEC") on August 9, 2012 (the "Affected Filing").   The misstatement understated general and administrative expenses, net loss attributable to common shareholders and net loss by approximately $3.8 million for the three and six month periods ended June 30, 2012.  The error also affected our disclosures regarding share-based compensation expense for the three and six month periods ended June 30, 2012.  As a result, the Company filed a Form 8-K on October 22, 2012 stating that the previously issued financial statements contained in the Affected Filing should no longer be relied upon and filed this restated Form 10-Q/A for the three and six month periods ended June 30, 2012 (the "Restated Financial Statements").

*In addition, we identified an error during November 2012 in the accounting treatment and reporting of a financing transaction completed in March 2012 for the sale of Series A Convertible Preferred Units of our majority owned subsidiary, Eureka Hunter Holdings, LLC ("Eureka Hunter") which resulted in the understatement of commodity and preferred stock embedded derivative liabilities of $44.1 million, an overstatement of series A convertible preferred units of Eureka Hunter of $44.3 million and an overstatement of gain on derivatives of $3.6 million and $1.4 million for the three and six month periods ended June 30, 2012, respectively and a misstatement of the related disclosures. The amounts and disclosures as included in the Affected Filing were also corrected in the Restated Financial Statements as described in Note 2 to the Restated Financial Statements contained herein.*

### Evaluation of disclosure controls and procedures

We maintain disclosure controls and procedures that are designed to provide reasonable assurance that information required to be disclosed in the reports we file under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Such controls include those designed to provide reasonable assurance that information for disclosure is accumulated and communicated to management, including the Chairman and Chief Executive Officer ("CEO") and the Chief Financial Officer ("CFO"), as appropriate, to allow timely decisions regarding required disclosure.

Our management, with the participation of our CEO and CFO, has re-evaluated the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Exchange Act) as of June 30, 2012. *Based on this evaluation, our CEO and CFO have concluded that, as of June 30, 2012, our disclosure controls and procedures were not effective due to the material weaknesses described below.*

To address the material weaknesses described in this Item 4, we performed additional analyses and other post-closing procedures designed to provide reasonable assurance that our consolidated financial statements were prepared in accordance with generally accepted accounting principles in the United States of America ("US GAAP"). *As a result of these procedures, we believe that the consolidated financial statements included in this report fairly present, in all material respects, our financial condition, results of operations, changes in stockholders' equity and cash flows for the periods presented, in conformity with US GAAP.*

* * *

### Material Weaknesses

A material weakness is a control deficiency, or a combination of control deficiencies, in internal control over financial reporting, such that there is a

reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis.

*In connection with the restatements and audit adjustments identified, management identified the material weaknesses described below.*

*Lack of sufficient, qualified personnel to design and manage an effective control environment. We did not design an effective control environment with the sufficient complement of personnel with the appropriate level of accounting knowledge, experience, and training in US GAAP to assess the completeness and accuracy of the accounting for complex accounting matters, principally related to equity instruments including convertible preferred stock and related arrangements. This material weakness resulted in the restatement of our Series A convertible preferred units of Eureka Hunter, our commodity and preferred stock embedded derivative liabilities and our loss on derivatives and related disclosures for the three and six month periods ended June 30, 2012 discussed above and resulted in audit adjustments to our consolidated financial statements for the three and six month periods ended June 30, 2012. This material weakness also contributed to the material weaknesses described below.*

*Period-end financial reporting process. We did not maintain effective controls over the period-end financial reporting process, including controls with respect to the preparation, review, supervision, and monitoring of accounting operations. Specifically, we did not maintain effective controls to provide reasonable assurance that monthly account reconciliations were reviewed on a timely basis and that monthly and quarterly financial information was prepared and reviewed timely.*

*This material weakness resulted in audit adjustments to our Restated Financial Statements for the three and six month periods ended June 30, 2012.*

*Share-based compensation. We did not design effective controls over share-based compensation expense, which is recorded in our general and administrative expenses. Specifically, we did not design effective controls related to the review of supporting details, including the completeness and accuracy of the vesting schedule and the journal entries for share-based compensation expenses. This control deficiency resulted in a misstatement of our general and administrative expense and share-based compensation related disclosures for the three and six month periods ended June 30, 2012 and resulted in the restatement discussed above.*

Additionally, the material weaknesses described above could result in misstatements that would result in a material misstatement of the consolidated financial statements in a future annual or interim period that would not be prevented or detected.

## Changes in Internal Control over Financial Reporting

Except for the material weaknesses discussed above and the remediation plans executed as of June 30, 2012 as noted below, there were no changes made in our internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) during the three months ended June 30, 2012, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

## Remediation Plans

*We have initiated several steps and plan to continue to implement measures designed to improve our internal control over financial reporting and disclosure controls and procedures in order to remediate the material weaknesses, noted specifically above.*

*To remediate the material weakness in our control environment, we have implemented management changes to establish an environment necessary to prevent or detect potential deficiencies in the preparation of our financial statements and controls to support our desired internal control over financial reporting and disclosure controls and procedures. On October 23, 2012, we hired a new Chief Accounting Officer with the appropriate knowledge and experience to establish and maintain our desired control environment. We will implement more formalized processes and controls to identify, review and document accounting treatment of complex capital-raising instruments. To implement these processes and controls related to the complete and timely evaluation of technical accounting issues, we will continue to add staff and/or seek assistance from outside consultants, as warranted. Accordingly, we are in the process of expanding our accounting department to respond to the recent growth of the Company. These additions include an Assistant Controller hired in July, 2012, Division Controller hired in November, 2012, and Internal Audit Manager hired in August, 2012 and other accounting personnel are being recruited for additional positions. We believe that the personnel we have recently added and that we plan to add, in combination with the other initiatives explained herein, will enable us to improve the scope and quality of our internal review of complex technical accounting matters and financial reporting and remediate this material weakness as well as aid in the remediation of the other two material weaknesses identified.*

*We are realigning the responsibilities and accountability in the financial reporting process and implementing additional monitoring and detective controls to remediate the material weakness in period-end financial reporting processes.* These additional controls include: checklists to ensure appropriate reviews of reconciliations are performed on a timely basis and a financial close timetable and reporting calendar by department that will be monitored by the Chief Accounting Officer to ensure these reviews are completed on timely basis to allow sufficient time for review by management and permit the timely

48

preparation and review of monthly and quarterly financial statements.

We plan to implement additional review controls and other controls with regard to share-based compensation activity around the completeness and accuracy of the schedules and related inputs including reviewer checklists to ensure all inputs and calculations are complete and accurate. We are in the process of implementing these controls and will rely on the controls while we continue to implement a new software system to track stock option activity and the related compensation expense and disclosures.

*We believe the foregoing efforts will effectively remediate the material weaknesses. As we continue to evaluate and work to improve our internal control over financial reporting, we may execute additional measures to address potential control deficiencies or modify the remediation plan described above.*

106.    The statements in paragraph 105 above omitted material information and were once again designed to and once again did falsely reassure investors that Magnum Hunter had both identified and corrected any defects in its internal controls, but in reality omitted to discuss the chronic, overarching internal control problems that existed and that were eventually disclosed in April 2013.

107.    Further, on November 14, 2012, the Company filed its Form 10-Q with the SEC for the interim financial period ended September 30, 2012, which further detailed the Company's third quarter financial results announced on November 13, 2012, and which was signed by Defendants Evans, Ormand, and D. Smith (the "3Q 2012 10-Q). As to the Company's "Controls and Procedures," the 3Q 2012 10-Q made representations similar to those in the restated 2Q 2012 10-Q detailed above in paragraph 105. The 3Q 2012 10Q also included the following language:

**Weaknesses in Internal Controls**

In October and November 2012, *we identified material weaknesses in our internal controls over financial reporting in connection with (i) our lack of sufficient qualified personnel to design and manage an effective control environment, (ii) our period-end financial reporting process and (iii) our share-based compensation*. We have promptly implemented, and are implementing,

measures we believe will effectively address these weaknesses. However, any failure to do so could adversely affect our compliance with our reporting obligations under the Securities Exchange Act of 1934, and our compliance with our debt covenants, and therefore our ability to effect borrowings and readily access the capital markets to provide required liquidity.

108.   Both the restated 2Q 2012 10-Q and the 3Q 2012 10-Q attached Sarbanes-Oxley certifications similar to those detailed above in paragraph 78.

109.   The statements in paragraph 108 above concerning the Company's internal and financial controls were false and misleading because they omitted to state (1) that the Company lacked sufficient qualified personnel to design and manage an effective control environment; (2) that the Company had material weaknesses in, among other things, its financial reporting process, accounting for its acquisition of NGAS, treatment of leasehold property costs, and tax accounting; (3) that, as a result, the Company lacked adequate internal and financial controls; and (4) that, as a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.   The Company and the Exchange Act Individual Defendants knew of or recklessly disregarded the material weaknesses in the Company's accounting system and the Company's lack of internal and financial controls for the following reasons, among others:

a)   during the Class Period, according to CW 1 and CW 2, the Company's accounting department was understaffed, lacked technical expertise, and failed to maintain even basic accounting controls such as separating the responsibilities for providing journal entries and for posting them and adequately overseeing accounts payable;

b)   according to CW 1, CW 4, and CW 6, accounting for the Company's acquisition of NGAS was handled by a single person who refused to let others review her work and was never audited;

c)      according to CW 1 and CW 5, shortcuts were taken in accounting for the Company's joint interest ventures which resulted in inaccurate billing;

d)      beginning in September 2012 but particularly in December 2012, according to CW 3, Defendant Ferguson asked her to change oil and gas production numbers to make "his numbers [] look good at the end of the year"; and

e)      beginning in September 2012, according to CW 7, Defendant Kreuger was performing nearly the entirety of the accounting functions at GreenHunter, neglecting his duties at Magnum Hunter.

110.    On November 28, 2012, Magnum Hunter filed an annual proxy statement with the SEC on Form DEF 14A (the "2012 Proxy") announcing a January 17, 2013 annual shareholder meeting.  One of the matters shareholders would be asked to vote on at the meeting was ratification of the Board's engagement of PwC to audit its 2012 financial statements.  In this regard, the 2012 Proxy statement distributed stated, in pertinent part, that the Company's Audit Committee "believed it to be in the best interests of our stockholders to have engaged PwC as our independent registered public accounting firm to audit the Company's financial statements for the fiscal year ending December 31, 2012."  The 2012 Proxy also disclosed that Defendant Evans' receipt of a $650,000 cash bonus and $3,181,100 in equity incentive compensation for fiscal 2012 had resulted in his being paid total compensation of $4,319,229 for fiscal 2012 and that Defendant Ormand's receipt of a $240,625 cash bonus and $1,223,500 in equity incentive compensation for fiscal 2012 had resulted in his being paid total compensation of $751,091 for fiscal 2012.  Short-term performance factors that contributed to these bonuses included increasing "[t]he fully diluted market capitalization of the Company [to] $1 billion or greater" and "rais[ing] $100 million or more of capital through the issuance of Series D Preferred Stock."

51

111.    On December 5, 2012, the Company priced a "best efforts" underwritten public offering of 1,000,000 depositary shares ("Depositary Shares"), each representing a 1/1,000th interest in a share of the Company's 8% Series E Cumulative Convertible Preferred Stock (with a liquidation preference of $25,000 per share, which is equivalent to $25 per Depositary Share) at a public offering price of $23.50 per Depositary Share (the "December 5, 2012 Series E Offering").   The Company closed the December 5 Series E Offering, receiving net proceeds, after underwriters' commissions and anticipated offering expenses, of approximately $21.9 million.   Notably, the prospectus supplement for the December 5, 2012 Series E Offering disclosed that "[w]e have identified certain weaknesses in our internal controls, which we are remediating, but failure to do so could adversely affect our capital raising ability":

> In October and November 2012, we identified material weaknesses in our internal controls over financial reporting in connection with (i) our lack of sufficient qualified personnel to design and manage an effective control environment, (ii) our period-end financial reporting process and (iii) our share-based compensation. The first material weakness, the lack of sufficient qualified personnel, resulted in the restatement of certain preferred units of Eureka Holdings, our commodity and preferred stock embedded derivative liabilities and our loss in derivatives and related disclosures for the three and six month periods ended June 30, 2012 that resulted in audit adjustments to our condensed consolidated financial statements for the three and nine month periods ended September 30, 2012. The second material weakness, the lack of effective controls over our period-end financial reporting process, resulted in monthly account reconciliations and monthly and quarterly financial information not being timely prepared and/or reviewed, thereby causing audit adjustments to our condensed consolidated financial statements for the three and nine month periods ended September 30, 2012. The third material weakness, which related to our internal controls over financial reporting relating to our share-based compensation, resulted in inaccuracies in the vesting schedule and journal entries relating to our share-based compensation expense that caused us to restate our general and administrative expense and our share-based compensation disclosures for the three and six months ended June 30, 2012. We have promptly implemented, and are implementing, measures we believe will effectively address these weaknesses. However, any failure to do so could adversely affect our compliance with our reporting obligations under the Securities Exchange Act of 1934, and our compliance with our debt covenants, and therefore our ability to effect borrowings and readily access the capital markets to provide required liquidity.

112.    On December 13, 2012, the Company announced its intention to offer up to $150 million in aggregate principal amount of its Senior Notes (the "Second Private Notes Offering"). The Second Private Notes Offering would close on or about December 18, 2012.  The Second Private Notes Offering would be an add-on offering to the Company's May 16, 2012 $450 million private notes offering.

113.    On December 31, 2012, Magnum Hunter disclosed that in connection with the prior postponements of the Annual Meeting, the NYSE notified the Company on October 16, 2012 that the Company was at risk of violating Section 302.00 of the NYSE's listing standards, which requires listed companies to hold an annual shareholders' meeting during each fiscal year.  On November 19, 2012, the Company requested an extension of time within which to hold the Annual Meeting.  On November 30, 2012, the NYSE granted the Company's requested extension and agreed to waive the requirement of Section 302.00 provided that the Company would hold the Annual Meeting on January 17, 2013.  The 2012 annual shareholder meeting was held on January 17, 2013, with most shareholder proposals obtaining shareholder approval.

114.    On January 23, 2013, Magnum Hunter agreed to offer for sale two million Depositary Shares, each representing a 1/1,000th interest in a share of the Company's 8% Series E Cumulative Convertible Preferred Stock.

115.    On January 23, 2013, Magnum Hunter issued a press release announcing the Company's estimated total proved reserves at year-end 2012 entitled, "Magnum Hunter Resources Announces Total Proved Oil & Gas Reserves Increased to 73.1 Million Barrels of Oil Equivalent at Year-End 2012- Proved Reserves Up 63% From Year-End 2011; Present Value (PV-10) Up 59% From Year-End 2011 to $981 Million."   In

addition to purportedly detailing the Company's then-present reserves, the press release

stated, in pertinent part, as follows:

> Mr. Gary C. Evans, Chairman and Chief Executive Officer of Magnum Hunter, commented, "Our Company's reserve growth is a key element of determining and evaluating our level of success in any given year.  As we continue to harvest the many undeveloped opportunities in our various shale plays, we should also continue booking substantial reserve growth in each of them which further enhances our future liquidity and equity value.  New reserve growth probabilities this year will exist in the new natural gas and ngl bookings anticipated in North Dakota and Saskatchewan once midstream infrastructure currently in process has been completed.  Additionally, we have yet to book any proved reserves in the emerging Utica Shale Play where Magnum Hunter controls over 80,000 net acres and where a significant focus of new drilling efforts is planned for this year."

116.    On February 28, 2013, the Company filed a Notification of Late Filing with

the SEC on Form 12b-25 wherein the Company stated, in relevant part, as follows:

> As previously disclosed in filings with the Securities and Exchange Commission (the "SEC"), in October and November 2012, Magnum Hunter Resources Corporation (the "Company") identified material weaknesses in its internal controls over financial reporting with its (i) lack of sufficient qualified personnel to design and manage an effective control environment, (ii) period-end financial reporting process and (iii) share-based compensation.   The Company devoted substantial time and effort to correcting the previously filed financial statements and information that were impacted by these material weaknesses.  Further, the Company implemented, and continues to implement, measures that it believes will effectively address these weaknesses in the future.   ***The implementation of these measures has entailed the substantial efforts of accounting staff and the use of external resources***.    Additionally, the Company has devoted significant resources to preparing financial statements and information relating to the Company and its subsidiaries for inclusion in the exchange offer for Senior Notes contemplated by the Company's Registration Statement on Form S-4, which was declared effective by the SEC on February 7, 2013.

> The change in the Company's independent auditors, which occurred in July 2012, has resulted in a normal transition between accounting firms that has required the Company to devote more resources to this transition.    Therefore, additional internal controls and significant review of certain financial matters were required by the new auditors.

> The diversion of these resources has caused the Company to be unable to compile all information necessary to prepare and file its Annual Report on Form 10-K for

the year ended December 31, 2012 within the prescribed period (on or before March 1, 2013) without unreasonable effort or expense. The Company anticipates that it will file its Annual Report on Form 10-K no later than March 18, 2013.

117. On March 18, 2013, Magnum Hunter issued a press release entitled "Magnum Hunter Provides Update on Status of Annual Report on Form 10-K and Selected Unaudited Financial and Operating Data for the Three Months and Twelve Months Ended December 31, 2012," which further disclosed, in pertinent part, as follows:

> As previously disclosed, Magnum Hunter identified certain material weaknesses in its internal controls over financial reporting in connection with its (i) lack of sufficient qualified personnel to design and manage an effective control environment, (ii) period-end financial reporting processes and (iii) share-based compensation. Magnum Hunter has implemented, and continues to implement, measures to address these weaknesses in the future. These measures have included the employment of a significant number of more experienced accounting personnel, including the addition of the following new personnel: a chief accounting officer, a head of financial reporting, a head of internal audit, a head of tax, two Company controllers, and two regional controllers. In addition, Magnum Hunter is utilizing third party technical resources, including consultants and professional advisory firms, to assist in the implementation of these measures. Magnum Hunter also intends to implement a new integrated accounting and land information system during fiscal year 2013. The Company may identify additional material weaknesses as it finalizes its financial statements for fiscal 2012 and, if so, it will take appropriate measures to address any such weaknesses.

> The Company's rapid growth, particularly during the last 24 months, has resulted in complex and challenging accounting issues and operational integration matters that have required a significant amount of time and human resources in order to complete the fiscal 2012 audit. **_Magnum Hunter continues to work diligently with PricewaterhouseCoopers LLP, its independent auditors, to provide all the necessary information, including the finalization of all adjustments and supporting analysis, so they can complete the audit of the Company's financial statements for the fiscal year ended December 31, 2012 as promptly as possible. At this time, Magnum Hunter is not aware of any disagreements with its auditors regarding the Company's fiscal 2012 financial statements._** In addition, the Company has not discovered any material errors or omissions that would require a restatement of its previously issued unaudited 2012 quarterly financial information.

> Magnum Hunter expects to obtain the necessary consents from its lenders under the Company's senior credit facility to allow the Company to provide its 2012

audited consolidated financial statements at a later date, and also expects to obtain similar consents from the lenders under Eureka Hunter Pipeline, LLC's credit facilities. In addition, Magnum Hunter intends to take the appropriate action to prevent or cure any default under the Company's senior notes indenture resulting from its failure to timely file this audited financial information.

While the February 28, 2013 filing and March 18, 2013 press release disclosed that the internal control defects had not been remedied as previously stated, it concealed that the Company was then at loggerheads with PwC over several aspects of its accounting practices, that PwC would ultimately be unwilling to sign off on Magnum Hunter's 2012 financial report, and that the Company's prior financial reports did not fairly represent the Company's actual financial results. Furthermore, it concealed the chronic, overarching internal control problems that existed and that were eventually disclosed in April 2013.

118. The March 18, 2013 press release also contained certain "Selected Unaudited Financial and Operating Data for the Three Months and Twelve Months Ended December 31, 2012," and guidance for the Company's fiscal 2012 financial results. Specifically, the release stated that 2012 revenues had increased by 141% to $274 million, oil and gas production had increased 139% to 4,800 mboe, oil and gas average daily production had increased 140% to 5,511 Boepd, and that adjusted EBITDAX had increased 217% to 160 million. The March 18, 2013 press release also provided the following disclosures concerning an impairment charge being taken:

**Liquidity, Anticipated Impairment Charges and Dividends**

The Company had liquidity of approximately $100 million as of March 15, 2013. The Company believes it has sufficient liquidity and projected cash flow from operations to fund its projected fiscal 2013 upstream capital budget of $300 million, absent any contemplated asset sales. The Company is continuing to aggressively pursue planned monetizations of certain of its properties, including its Eagle Ford Shale properties, to further enhance its liquidity, and the Company expects to announce the results of such activities in the near future.

*The Company anticipates non-cash charges for impairment to its unproved properties and proved properties of approximately $49 million and approximately $16 million, respectively, in the three months ended December 31, 2012. As a result, the Company expects non-cash charges for impairment to its unproved properties and proved properties of approximately $55 million and approximately $16 million, respectively, in the twelve months ended December 31, 2012. The Company is reviewing whether additional impairment charges will be required.* None of the expected impairment charges relate to the Company's Eagle Ford Shale properties, and any additional non-cash impairment charges that may be identified are not expected to relate to such properties.

### B.      The Truth Comes To Light

119.    On April 16, 2013 the Company filed a Current Report on Form 8-K with the SEC wherein the Company stated, in relevant part, as follows:

**Item 4.01      Changes in Registrant's Certifying Accountant.**

On April 10, 2013, Magnum Hunter Resources Corporation (the "Company"), at the direction of the Audit Committee (the "Audit Committee") of the Company's Board of Directors (the "Board"), *dismissed PricewaterhouseCoopers LLP ("PwC") as the Company's independent registered public accounting firm for the fiscal year ended December 31, 2012, effective immediately*. PwC was engaged as the Company's independent registered public accounting firm on July 17, 2012. PwC has not completed an audit or issued an audit report on the Company's consolidated financial statements for the fiscal year ended December 31, 2012. The decision to dismiss PwC was unanimously approved by the Audit Committee on April 10, 2013, and such decision was unanimously ratified by the Board on April 13, 2013.

PwC was not engaged (and did not serve) as the Company's independent registered public accounting firm at any time prior to its engagement as the Company's independent registered public accounting firm on July 17, 2012. During the period beginning on July 17, 2012 and ending on the date of PwC's dismissal (the "Applicable Time Period"), *there were no disagreements between the Company and PwC on any matter of accounting principles or practices, financial statement disclosure or auditing scope or procedure, which disagreements, if not resolved to the satisfaction of PwC, would have caused PwC to make reference to the subject matter of the disagreements in connection with its reports on the Company's consolidated financial statements for the fiscal year ended December 31, 2012.*

During the Applicable Time Period, there were no "reportable events" as that term is defined in Item 304(a)(l)(v) of Regulation S-K under the Securities Act of 1933, as amended (the "Securities Act"), relating to PwC's engagement as the

57

Company's independent registered public accounting firm, except that PwC advised the Company (A) (i) *that information had come to PwC's attention that if further investigated may have a material impact on the fairness or reliability of Company's consolidated financial statements, and this information was not further investigated and resolved to PwC's satisfaction prior to its dismissal, and (ii) of the need to significantly expand the scope of PwC's audit of the Company's consolidated financial statements for the fiscal year ended December 31, 2012, and due to PwC's dismissal, PwC did not complete its expanded procedures (collectively, the matters in (i) and (ii) above, the "PwC Identified Matters"), and (B) of certain deficiencies in the Company's internal controls over financial reporting that constitute material weaknesses during the Applicable Time Period (whether identified by the Company or PwC), which led PwC to believe that internal controls necessary for the Company to develop reliable financial statements did not exist, and therefore, PwC significantly expanded the scope of its audit of the Company's consolidated financial statements for the fiscal year ended December 31, 2012 for purposes of completing such audit.* However, the Company believes that it has implemented the internal controls and processes necessary to develop reliable financial statements and allow its successor independent accounting firm to complete the audit of the Company's consolidated financial statements for the fiscal year ended December 31, 2012. The Company will be working with its successor independent accounting firm to complete the audit of such consolidated financial statements.

PwC Identified Matters.   The PwC Identified Matters consisted of the following and were under review and analysis by both PwC and the Company at the time of PwC's dismissal. As of the date of the filing of this Current Report on Form 8-K, the Company does not believe that there are any misstatements, errors or omissions that would require any restatement of any of the Company's prior period financial statements. The Company believes that the PwC Identified Matters arose primarily due to a period of rapid growth of the Company. The Company believes that such growth will significantly enhance future shareholder value, but in the near term this growth strained the accounting resources of the Company. The Company has been addressing and will continue to address these issues by expanding and upgrading the personnel in its accounting department and is also utilizing the advisory services of a "Big Four" accounting firm to assist the Company in completing its Annual Report on Form 10-K for the fiscal year ended December 31, 2012 and in upgrading its accounting department and systems.

*Property Accounting and Transfers of Unproved Properties.*  PwC requested additional information to support the estimation of the valuation of the Company's oil and gas properties (including information regarding the timing of non-cash impairments and lease expiration and extensions). In addition, PwC requested support of the timing of transferring the classification of certain of such properties from unproved to proved and the effect of such transfers on non-cash impairments and depletion. The Company has substantially completed such analysis, which it will provide to its successor independent accounting firm.

Such analysis indicated no material adjustments were necessary other than with respect to transfers and impairments that were recorded in the third quarter ended September 30, 2012 and prior periods.  As previously disclosed, the Company anticipates unproved property impairments in the amount of $71 million which will be recorded in the quarter ended December 31, 2012.  Further additional adjustments, if any, that would be material would all be non-cash charges.

*Oil and Gas Reserves.*  PwC has requested additional information and support for some of the underlying assumptions from which the reserve report issued by the Company's independent petroleum engineering firm on the Company's oil and gas reserves as of December 31, 2012 was derived.  Such additional analysis included the proposed capital budget for 2013 supporting such assumptions and analysis of lease operating expenses in the Company's Magnum Hunter Production subsidiary ("MHP").  The Company has completed such analysis and believes no adjustments are necessary to such reserve report as its capital budget supports such assumptions and the MHP lease operating expenses analyzed are consistent with the assumptions made with respect thereto in the reserve report.  PwC also requested additional support for the underlying division of interest of properties (which, in addition to oil and gas reserves, could affect other matters including revenues, lease operating expenses and oil and gas properties), although management does not expect the division of interest analysis to result in any material adjustments to these items.  In addition, PwC requested that the Company perform additional analysis on its properties in the Tableland Field in Saskatchewan, Canada to determine if any non-cash impairment charges would be required.  PwC advised the Company that a material non-cash impairment charge should be recognized for such properties and the Company continues to review this matter based on updated engineering information from its independent petroleum engineering firm.  As previously disclosed, the Company anticipates property impairments in the amount of approximately $16 million which will be recorded in the quarter ended December 31, 2012.  Any such impairment would be a non-cash charge to earnings for 2012.  PwC also noted that a 2011 reserve report for certain significant subsidiaries of the Company indicated that it was prepared in accordance with the Canadian Oil and Gas Evaluation Handbook, and at the time of PwC's dismissal, PwC had not received adequate support as to whether such reserve report was prepared in accordance, or was materially consistent, with applicable U.S. and SEC standards.  The Company has confirmed that such reserve report was prepared in accordance, and was materially consistent, with applicable U.S. and SEC standards, and it has received a revised cover letter from its independent petroleum engineering firm to such effect (although the Company had not provided such letter to PwC by the time of its dismissal).

*Income Taxes.*  The Company and PwC discussed various issues relating to the Company's treatment of and positions with respect to certain income tax matters.  The Company believes that its tax entries for the fourth quarter of 2012 are correct and that there should be no material adjustment to prior period entries.

*Accounting regarding MHP.* PwC requested that the Company review certain assumptions relating to the Company's initial accounting in connection with its acquisition in 2011 of NGAS Resources, Inc., whose operations are now conducted in or under MHP. PwC also requested further analysis regarding the appropriateness of certain credits recorded in lease operating expenses, whether such credits are appropriate deductions in the reserve report, and, if the credits were not deemed to be appropriate deductions, whether changes in reserves would have a material impact on MHP's proved property impairments. The Company has determined, in conjunction with advice from its "Big Four" accounting firm advisor, that such accounting was recorded properly. PwC was still reviewing such matter and there was no final resolution thereof at the time of its dismissal.

*Prior Period Restatements.* The Company has reviewed whether Staff Accounting Bulletin 99 might require certain errors, if any, in prior fiscal years and/or fiscal quarters to be corrected in the applicable prior periods. The Company has determined that the adjustments to date are not material and thus do not require any restatements of prior period financial statements. Further, substantially all adjustments identified to date have been non-cash items.

*Ability to Meet Debt Covenants.* The ability of the Company to comply with its debt covenants in future fiscal periods related primarily to the late filing of the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2012. The Company has obtained waivers relating to this late filing under certain of its debt agreements, and intends to address the issues relating to this late filing arising under the indenture governing the Company's outstanding senior notes. In addition, the Company calculated projected financial statements and projected compliance with associated financial covenants under its debt agreements (based on the assumed closing of the Company's previously announced sale of its Eagle Ford Shale properties in which the cash portion of the purchase price is expected to be approximately $380 million (after purchase price adjustments) as well as the Company's revised upstream capital budget of $300 million). The Company believes that it will be able to remain in compliance with its financial covenants for the foreseeable future. Further, the Company has taken, and will continue to take, the appropriate additional actions necessary to prevent or cure any non-compliance with non-financial covenants under the Company's debt agreements as a result of the Company's failure to timely file its periodic reports under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), with the SEC.

*Capitalized Interest.* PwC asked the Company to consider whether certain interest expense associated with its unproved oil and gas properties should be capitalized. The Company's policy is to capitalize interest on expenditures for significant exploration and development projects that last more than six months. The Company and PwC were discussing approaches to capitalized interest but no conclusion had been reached at the time of PwC's dismissal. The Company's preliminary assessment is that it did not have any capitalized interest

expense associated with the development of its unproved oil and gas properties because none of such projects exceeded six months.  Any such adjustment in this regard would be a positive non-cash increase to net income in prior periods.

*Assets Held for Sale.*  In connection with the Company's pending sale of its Eagle Ford Shale properties, PwC asked the Company to consider whether such properties should be classified as "assets held for sale" as of December 31, 2012. The Company, in conjunction with advice from its "Big Four" accounting firm advisor, determined that the conditions required for such classification did not exist at December 31, 2012.

*Miscellaneous.*  In addition, other PwC Identified Matters include issues with respect to the Company's asset retirement obligations, revenue and lease operating expense accruals, share-based compensation, information technology systems and general controls, and manual post-closing entries, each of which were under review by PwC at the time of its dismissal and some of which the Company believes it has previously disclosed and corrected.  The Company continues to review these matters and will review them with its successor independent accounting firm, but at this time, the Company does not believe that these matters will materially impact the Company's consolidated financial statements.

<u>Internal Controls</u>. PwC advised the Company of the five categories of below-described deficiencies that constitute, or that PwC considered might constitute, material weaknesses in the Company's internal controls over financial reporting. The first, second and fourth categories below were generally previously disclosed by the Company.

120.    On this news, Magnum Hunter shares declined $0.49 per share, 14.76%, to close at $2.83 per share on April 17, 2013, on unusually heavy trading volume.

121.    Furthermore, on April 22, 2013, Magnum Hunter disclosed that PwC disagreed with Magnum Hunter's account of their parting, disclosing a letter from PwC, sent April 18, 2013, stating that PwC did "not agree with the statements concerning" whether there had been any "reportable events" as defined in Item 304(a)(1)(v) or Regulation S-K under the Securities Act of 1933, relating to PwC's engagement as the Company's independent registered public accounting firm.  PwC went on to state in the letter that PwC had "advised the Company that information [had come] to [its] attention that [PwC had] concluded materially impacts the fairness or reliability of the Company's consolidated financial statements

and this issue was not resolved to [PwC's] satisfaction prior to [its] dismissal," and that, with respect to the "PwC Identified Matters," "[t]he increases in our audit scope and/or the additional investigation were triggered by discrepancies noted during our audit testing or the material weaknesses in the Company's internal control over financial reporting, among other things." Tellingly, PwC further stated that it had "advised the Company that we believe the Company needs to evaluate the impact of 'tone at the top' on the control environment."  Upon revelation of this disagreement, the Company's stock further declined, on usually high trading volume, to close at $2.50 per share.

122.  By falsely inflating the Company's financial performance, and inflating Magnum Hunter's stock price, the Company and the Exchange Act Individual Defendants were able to: (1) generate upward movement in Magnum Hunter's stock price; (2) facilitate the sale of hundreds of thousands of dollars of privately-held Magnum Hunter stock by Defendants Evans and Kreuger at fraud-inflated prices; (3) facilitate the sale by Magnum Hunter of more than $900 million of its common stock, preferred shares and publicly-traded debt in multiple offerings conducted during the Class Period; (4) obtain a $40+ million increase in the borrowing base under its $750 million senior bank facility in March 2013; (5) meet forecasted revenue and net income amounts; (6) use the Company's artificially inflated stock price to acquire numerous assets; (7) maintain the illusion of the Company's growth to investors; and (8) justify the excessive compensation and undeserved bonuses the Exchange Act Individual Defendants were awarded.

123.  Following the April 16, 2013 disclosure of PwC's potential disagreement with Magnum Hunter's accounting practices requiring additional investigation, Magnum Hunter's resulting termination of PwC, Magnum Hunter's resulting inability to provide timely audited

financial results for fiscal 2012, and Magnum Hunter's admission of significant defects in its

internal controls, and the April 22, 2013 confirmation that PwC had concluded the Company's

previously-reported financial reports did not fairly or reliably reflect its actual financial results,

the price of Magnum Hunter stock, which had traded as high as $7.71 per share during the Class

Period, plummeted **_more than 67%_** to close at $2.50 per share on April 22, 2013, **_erasing_**

**_more than $878.5 million in market capitalization._**

124.    On June 14, 2013, Magnum Hunter filed its Form 10-K for the fiscal year ended

December 31, 2012.  In its 2012 Form 10-K, the Company disclosed a pending SEC inquiry

related to its decision to change auditors:

> [O]n April 26, 2013, we were advised by the staff of the SEC Enforcement
> Division that the SEC had commenced an inquiry into matters disclosed in certain
> of our SEC filings and press releases, as well as the sufficiency of our internal
> controls and our decisions to change auditors from Hein & Associates LLP to
> PricewaterhouseCoopers LLP, or PwC, and from PwC to BDO USA, LLP, among
> other matters. This inquiry is ongoing and we are cooperating with the SEC in
> connection with these matters.
>                                          * * *
> The Company also received an April 26, 2013 letter from the SEC stating that the
> SEC's Division of Enforcement was conducting an inquiry regarding the
> Company's internal controls, change in outside auditors and public statements to
> investors and asking the Company to preserve documents relating to these
> matters.  The Company is complying with this request.

## VI.    SECURITIES ACT CLAIMS

125.    Plaintiffs' Securities Act claims center around Magnum Hunter's May 3, 2012

Offering.  Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-124, as if fully

set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or

the intent of Magnum Hunter, the Securities Act Individual Defendants, or the Underwriter

Defendants to defraud Plaintiffs or members of the Class.

126.    On May 3, 2012, the Company announced a public offering of 35,000,000

shares of Magnum Hunter's common stock (the "Offering"), to be underwritten by Defendants Credit Suisse and Citigroup, as Joint Global Coordinators and Joint Book-Running Managers for the Offering.  On May 11, 2012, it was announced that the shares offered in the Offering were being priced at $4.50 per share.  On May 16, 2012, the Company completed the Offering.  The prospectus supplement used to conduct the Offering, which was incorporated into the Company's January 18, 2012 Registration Statement, was false and misleading in that it omitted to state (1) that the Company lacked sufficient qualified personnel to design and manage an effective control environment; (2) that the Company had material weaknesses in, among other things, its financial reporting process, accounting for its acquisition of NGAS, treatment of leasehold property costs, and tax accounting; (3) that, as a result, the Company lacked adequate internal and financial controls; and (4) that, as a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.  Indeed, the prospectus supplement used to conduct the Offering omitted a risk warning later included in the prospectus supplement for the Company's December 5, 2012 Series E Offering, namely that "[w]e have identified certain weaknesses in our internal controls, which we are remediating, but failure to do so could adversely affect our capital raising ability."  *See* paragraph 111, *supra*.

## VII.   DEFENDANTS' VIOLATIONS OF GAAP AND SEC RULES

127.    GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.  GAAP are the official standards accepted by the SEC and promulgated in part by the American Institute of Certified Public Accountants ("AICPA") and the Financial Accounting Standards Board ("FASB").

128.    SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements

filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying the most recent annual financial statements.  17 C.F.R. § 210.10-01(a).

### A.    Defendants' Responsibility for Financial Statements

129.    As a publicly-traded company, Magnum Hunter was required, during the Class Period, to maintain books and records in sufficient detail to reflect the transactions of the Company and, therefore, to prepare financial statements in accordance with GAAP. Specifically, the Exchange Act requires public companies to:

(A)    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

(B)    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

i.    transactions are executed in accordance with management's general or specific authorization;

ii.    transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets;

iii.    access to assets is permitted only in accordance with management's general or specific authorization; and

iv.    the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

130.    The responsibility for preparing the financial statements in conformity with GAAP rests with the Company's management, as, for example, set forth in the AICPA Auditing

Standards ("AU"), in relevant part:

> The financial statements are management's responsibility …. Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, initiate, authorize, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management …. Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.

> AU 110.0 (footnote omitted).

The Company's various SEC filings affirmed this responsibility as well, as set forth above.

### B. Ineffective Disclosure Controls and Procedures and Internal Control Over Financial Reporting

131.   Throughout the Class Period, the Company lacked adequate disclosure controls and procedures, and lacked adequate internal control over financial reporting despite certifications and representations by certain Defendants asserting the adequacy of such.

132.   The SEC defines "disclosure controls and procedures" as:

> … controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports filed or submitted by it under the [Securities Exchange Act] is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure information required to be disclosed by an issuer in the reports that it files or submits under the [Securities Exchange Act] is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

17 C.F.R. § 240.13a-15(e), 240.15d-15(e).

133.   The SEC defines "internal control over financial reporting" as a process "to provide reasonable assurance regarding the reliability of financial reporting and *the preparation of financial statements for external purposes in accordance with [GAAP]*…" 17 C.F.R. §

240.13a-15(f), 240.15d-15(f)) (emphasis added).

134.    The Exchange Act requires the Company to maintain effective disclosure control and procedures, and internal control over financial reporting.  The Company's management, including its principal executive and principal financial officers, must evaluate (a) the effectiveness of its disclosure controls and procedures as of the end of each fiscal quarter-end; (b) the effectiveness of its internal control over financial reporting as of the end of each fiscal year-end; and (c) any changes in internal control over financial reporting that materially affected, or were reasonably likely to materially affect, its internal control over financial reporting during each fiscal quarter.  17 C.F.R. § 240.13a-15, 240.15d-15.  SEC Regulation S-K requires the Company's principal executive and principal financial officers to quarterly and annually, as applicable, disclose the conclusions of such evaluations.   17 C.F.R. § 229.307, 229.308.

135.    The ultimate goal of this process is for company management to express an opinion on the effectiveness of the company's internal control over financial reporting, because a company's internal control cannot be considered effective if one or more material weaknesses exist.  A material weakness is a control deficiency, or a combination of control deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of a Company's financial statements will not be prevented or detected on a timely basis.  The Company's disclosure controls and procedures, and internal control over financial reporting, were not effective throughout the Class Period.   Specifically, the Company's disclosure controls and procedures, and internal control over financial reporting, were ineffective because the Company (1) lacked sufficient qualified personnel to design and manage an effective control environment and (2) had material weaknesses in, among other things, its financial

67

reporting process (including but not limited to period-end financial reporting, consolidations, share-based compensation, acquisitions and divestitures, land and leasehold cost accounting, valuation of oil and gas properties, and calculation of oil and gas reserves), leasehold property costs, share-based compensation, equity instruments, tax accounting, capitalized interest, and segregation of duties and timeliness of reporting with respect to partnership accounting, revenue, joint interest accounting and division of interests.

136.    Throughout the Class Period, Magnum Hunter, Evans, Ormand, Kreuger, and D. Smith inappropriately disclosed in the Company's public filings that the Company's disclosure controls and procedures and internal control over financial reporting were effective.   These Defendants further failed to disclose in its public filings numerous material weaknesses that existed and the impact of these material weaknesses on its reported financial results.  As such, throughout the Class Period, these Defendants caused the Company to mislead investors regarding the effectiveness of the Company's disclosure controls and procedures and internal control over financial reporting, and thereby mislead investors that the Company's financial statements had been prepared in accordance with GAAP.

## VIII.   CLASS ACTION ALLEGATIONS

137.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons who purchased or otherwise acquired Magnum Hunter securities during the Class Period and who were damaged thereby (the "Class").  Excluded from the Class are each of the Defendants, members of the immediate family of each of the Securities Act Individual Defendants and Exchange Act Individual Defendants, any subsidiary or affiliate of Magnum Hunter and the directors, officers and employees of the Company or its subsidiaries or affiliates, and any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of

any excluded person.

138.    The members of the Class are so numerous that joinder of all members is impracticable.   While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members of the Class located throughout the United States.   Throughout the Class Period, Magnum Hunter securities were actively traded on the New York Stock Exchange (the "NYSE") – an open and efficient market.   Record owners and other members of the Class may be identified from records maintained by Magnum Hunter and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

139.    Plaintiffs' claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

140.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

141.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

        a.    whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

        b.    whether Defendants participated in and pursued the common course of conduct complained of herein;

        c.    whether documents, press releases, and other statements disseminated to

the investing public and the Company's shareholders during the Class Period omitted material facts about the adequacy of the Company's internal and financial controls;

        d.     whether statements made by Defendants to the investing public during the Class Period omitted to disclose material facts about the adequacy of the Company's internal and financial controls;

        e.     whether the market price of Magnum Hunter securities during the Class Period was artificially inflated due to the material omissions and failures to correct the material omissions complained of herein; and

        f.     the extent to which the members of the Class have sustained damages and the proper measure of damages.

142.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this suit as a class action.

143.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this suit as a class action.

## IX.    LOSS CAUSATION

144.    During the Class Period, as detailed herein, the Company and the Exchange Act Individual Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Magnum Hunter's securities and operated as a fraud or deceit on Class Period purchasers of Magnum Hunter's securities by failing to disclose to investors that the Company's internal and financial controls were inadequate.   When the Company's and the Exchange Act Individual Defendants' omissions and fraudulent conduct were disclosed and became apparent to the market, the prices of Magnum Hunter's securities fell precipitously as the prior inflation came out of the Company's stock price.  As a result of their purchases of Magnum Hunter's securities during the Class Period, Plaintiffs and the other Class members suffered economic loss.

145.    By failing to disclose the true state of the Company's internal and financial controls, investors were not aware of the actual state of the Company's internal and financial controls.   Therefore, the Company and the Exchange Act Individual Defendants presented a misleading picture of Magnum Hunter's business.   Thus, instead of truthfully disclosing during the Class Period the true state of the Company's business, the Company and the Exchange Act Individual Defendants caused Magnum Hunter to conceal the truth.

146.    The Company's and the Exchange Act Individual Defendants' false and misleading omissions had the intended effect and caused Magnum Hunter's securities to trade at artificially inflated levels throughout the Class Period.  The stock price drops discussed herein caused real economic loss to investors who purchased the Company's securities during the Class Period.

147.    The decline in the price of Magnum Hunter's securities after the truth came to light was a direct result of the nature and extent of the Company's and the Exchange Act

Individual Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of Magnum Hunter's stock price decline negates any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Company's and the Exchange Act Individual Defendants' fraudulent conduct.  The economic loss suffered by Plaintiffs and the other Class members was a direct result of the Company's and the Exchange Act Individual Defendants' fraudulent scheme to artificially inflate the prices of Magnum Hunter's securities and the subsequent decline in the value of Magnum Hunter's securities when the Company's and the Exchange Act Individual Defendants' omissions and other fraudulent conduct were revealed.

## X.     APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

148.    Plaintifs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because claims asserted herein against Defendants are predicated in part upon material omissions of fact that Defendants had a duty to disclose.

149.    In the alternative, Plaintiffs are entitled to a presumption of reliance on Defendants' material omissions pursuant to the fraud-on-the-market doctrine because the market for Magnum Hunter's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading omissions, Magnum Hunter's securities traded at artificially inflated prices during the Class Period.  On February 24, 2012, the Company's stock closed at a Class Period high of $7.53 per share.   Plaintiffs and other members of the Class purchased or otherwise acquired Magnum Hunter's securities relying upon market information and the integrity of the market price of the Company's securities and as a result have been damaged thereby.

150.    At all relevant times, the market for Magnum Hunter securities was an efficient market for the following reasons, among others:

a.    Magnum Hunter stock (stock symbol "MHR") met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient market;

b.    As a regulated issuer, Magnum Hunter filed periodic public reports with the SEC and the NYSE;

c.    Magnum Hunter securities were followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace; and

d.    Magnum Hunter regularly issued press releases that were carried by national newswires.  Each of these releases was publicly available and entered the public marketplace.

151.    As a result, the market for Magnum Hunter securities promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in their prices.   Under these circumstances, all purchasers of Magnum Hunter securities during the Class Period suffered similar injury through their purchase of securities at artificially inflated prices and a presumption of reliance applies.

## COUNT I
**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against the Company and the Exchange Act Individual Defendants**

152.    Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.  This claim is asserted against the Company and the Exchange Act Individual Defendants, and specifically with regard to Defendant F. Smith for the time period beginning

when he became CAO in October 2012 and onward.

153.   During the Class Period, Magnum Hunter and the Exchange Act Individual Defendants, and each of them, carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii)  artificially  inflate and maintain the market price of Magnum Hunter securities; and (iii) cause Plaintiffs and other members of the Class to purchase Magnum Hunter securities at artificially inflated prices.   In furtherance of this unlawful plan, scheme, and course of conduct, the Company and the Exchange Act Individual Defendants, and each of them, took the actions set forth herein.

154.   These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Magnum Hunter securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  The Company and the Exchange Act Individual Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  The Exchange Act Individual Defendants are also sued as controlling persons of Magnum Hunter, as alleged herein.

155.   In addition to the duties of full disclosure imposed on the Company and the Exchange Act Individual Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S- X (17 C.F.R. § 210.01, *et seq.*) and S-K (17 C.F.R. § 229.10, *et seq.*) and

other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition, and performance so that the market prices of the Company's publicly-traded securities would be based on truthful, complete, and accurate information.

156.   Magnum Hunter and the Exchange Act Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the adequacy of Magnum Hunter's internal and financial controls as specified herein.  These Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Magnum Hunter's value and performance and substantial growth, which included omitting to state material facts necessary in order to make the statements made about Magnum Hunter and its internal and financial controls, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in practices and a course of business which operated as a fraud and deceit upon the purchasers of Magnum Hunter's securities during the Class Period.

157.   Each of the Exchange Act Individual Defendants' primary liability, and controlling person liability, arises from the following facts:  (i) each of the Exchange Act Individual Defendants was a high-level executive and/or director at the Company during the Class Period; (ii) each of the Exchange Act Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's

operational and financial projections and/or reports; (iii) the Exchange Act Individual Defendants enjoyed significant personal contact and familiarity with each other and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) the Exchange Act Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

158.    The Company and the Exchange Act Individual Defendants had actual knowledge of the omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them.  Such Defendants' material omissions were made knowingly or recklessly and for the purpose and effect of concealing the state of Magnum Hunter's internal and financial controls from the investing public and supporting the artificially- inflated price of its stock.  As demonstrated by their omissions concerning the Company's accounting, internal controls, and financial condition throughout the Class Period, the Exchange Act Individual Defendants, even if they did not have actual knowledge of the omissions alleged, were severely reckless in failing to obtain such knowledge by deliberately refraining from taking steps necessary to discover whether those omissions were false or misleading.

159.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Magnum Hunter securities was artificially inflated during the Class Period. In ignorance of the fact that the market price of Magnum Hunter shares was artificially inflated, and relying directly or indirectly on the omissions made by the Company and the Exchange Act Individual Defendants, upon the

integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by these Defendants but not disclosed to the public by these Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Magnum Hunter securities during the Class Period at artificially-inflated prices and were damaged thereby.

160.   At the time of said omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known of the true state of Magnum Hunter's internal and financial controls, which was not disclosed by the Company and the Exchange Act Individual Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired Magnum Hunter securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially-inflated prices which they paid.

161.   By virtue of the foregoing, Magnum Hunter and the Exchange Act Individual Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

162.   As a direct and proximate result of the Company's and the Exchange Act Individual Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT II
### For Violations of Section 20(a) of the Exchange Act
### Against the Exchange Act Individual Defendants

163.   Plaintiffs repeat and reallege the allegations set forth above as if set forth fully herein.  This claim is asserted against the Exchange Act Individual Defendants, and specifically

with regard to Defendant F. Smith for the time period beginning when he became CAO in October 2012 and onward.

164. The Exchange Act Individual Defendants were and acted as controlling persons of Magnum Hunter within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Exchange Act Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the dissemination of the various omissions which Plaintiffs contend are false and misleading. Each of the Exchange Act Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the making of material omissions or cause affected statements to be corrected.

165. In addition, each of the Exchange Act Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

166. As set forth above, Magnum Hunter and the Exchange Act Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their controlling positions, the Exchange Act Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered

damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT III
### For Violations of Section 11 of the Securities Act
### Against Defendant Magnum Hunter, the Underwriter Defendants, and the Securities Act Individual Defendants

113.   Plaintiffs repeat and reallege the allegations set forth above as if set forth fully herein.

114.   This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, against the Securities Act Individual Defendants, who signed the Registration Statement for the Company's Offering.  It is also brought against the Company, which issued shares, and the Underwriter Defendants, which underwrote shares pursuant to the Company's Registration Statement.  These Defendants (collectively, the "Section 11 Defendants") violated, or controlled a person who violated, Section 11 of the Securities Act.

115.   This Count is not based on and does not sound in fraud.

116.   The Section 11 Defendants were responsible for the contents and dissemination of the Company's Offering Documents.

117.   The Offering Documents contained untrue statements of material facts, failed to state other facts necessary to make the statements made not misleading, and/or failed to state material facts required to be stated therein.

118.   None of the Section 11 Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Company's Offering Documents were true and without omissions of any material facts and were not misleading.

119.   Plaintiffs and the Class acquired the Company's common stock pursuant to the Offering Documents.  In particular, on May 11, 2012, Plaintiff DelCo purchased 8,310 shares in the Offering, at a price of $4.50 per share, from Defendant Citigroup.

79

120.    Plaintiffs and the Class have sustained damages in that the value of the Company's common stock has declined substantially from the prices at which it was purchased.

121.    At the time of their purchases of the Company's common stock, Plaintiffs and other members of the Class were without knowledge of the facts concerning the untrue statements or omissions alleged herein and could not have reasonably discovered those facts prior to the date that the initial complaint in this action was filed.

122.    Less than one year elapsed between the time that Plaintiffs or any member of the Class discovered or reasonably could have discovered the facts alleged herein, and the date that this Complaint was filed.  Less than three years elapsed between the time that Plaintiffs or any member of the Class purchased the common stock upon which this Count is brought and the date that this Complaint was filed.

**COUNT IV**
**For Violations of Section 12(a)(2) of the Securities Act**
**Against Defendant Magnum Hunter and the Underwriter Defendants**

123.    Plaintiffs repeat and reallege the allegations set forth above as if set forth fully herein.

124.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of Plaintiffs and all members of the Class who were offered or sold shares of the Company in the Offering, against Defendants Magnum Hunter and the Underwriter Defendants (collectively, the "Section 12(a)(2) Defendants").  These Defendants violated, or controlled a person who violated, Section 12(a)(2) of the Securities Act.

125.    This Count is not based on and does not sound in fraud.

126.    The Section 12(a)(2) Defendants offered, solicited, distributed, and/or sold a security, namely shares of the Company, by means of Offering Documents that contained untrue

80

and/or misleading statements of material fact, contained material omissions, or omitted material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

127.    The Section 12(a)(2) Defendants actively solicited the sale of the Company's common stock through Offering Documents, advertising, and other marketing efforts to serve their own financial interests, and are liable to Plaintiffs and Class members pursuant to Section 12(a)(2) of the Securities Act, as sellers of the Company's common stock.

128.    On May 11, 2012, Plaintiff DelCo purchased 8,310 shares in the Offering, at a price of $4.50 per share, from Defendant Citigroup.

129.    At the time they purchased the Company's common stock from the Section 12(a)(2) Defendants, Plaintiffs and other members of the Class did not know of the omissions made to them by the Section 12(a)(2) Defendants (in connection with the distribution of shares) and the matters described above, did not know the above-described omitted material facts were not disclosed and could not have reasonably discovered those facts.

130.    Less than one year elapsed between the time that Plaintiffs or any member of the Class discovered or reasonably could have discovered the facts alleged herein, and the date that this Complaint was filed.  Less than three years elapsed between the time that Plaintiffs or any member of the Class purchased the common stock upon which this Count is brought and the date that this Complaint was filed.

131.    Pursuant to Section 12(a)(2) of the Securities Act, Plaintiffs and Class members are entitled to recover, upon tender of the shares they purchased, the consideration paid for the shares with interest thereon, less the amount of any income received thereon, or damages resulting from the Section 12(a)(2) Defendants' conduct.

132.    Plaintiffs and putative Class members who still hold shares of the Company hereby tender any and all shares that were damaged by the Section 12(a)(2) Defendants' violation of Section 12(a)(2) of the Securities Act, in exchange for consideration paid for those shares, and any interest accrued thereon.

**COUNT V**
**For Violation of Section 15 of the Securities Act**
**Against the Securities Act Individual Defendants**

133.    Plaintiffs repeat and reallege the allegations set forth above as if set forth fully herein.

134.    This Count is brought pursuant to Section 15 of the Securities Act against the Securities Act Individual Defendants as control persons of the Company, which violated Sections 11 and Section 12, as described in Counts III and IV.

135.    Each of the Securities Act Individual Defendants was a control person of the Company by virtue of his or her position as a director of the Company.  The Securities Act Individual Defendants were in a position to, and did, control the Company's operations and disclosures made by the Company in the Offering Documents.

136.    The Securities Act Individual Defendants are liable, as control persons, for damages caused by the Company's violations of Sections 11 and Section 12.

137.    The Securities Act Individual Defendants did not make a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the Offering Documents were accurate and complete in all material respects.  Had they exercised reasonable care, they could have known of the material omissions alleged herein.

138.     This claim was brought within one year after the discovery of the omissions in the Offering Documents and within three years after the Company's common stock was sold to the Class.

139.     By reason of the misconduct alleged herein, for which the Company is primarily liable, as set forth above, the Securities Act Individual Defendants are jointly and severally liable with and to the same extent as the Company pursuant to the Securities Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Class, pray for judgment as follows:

a.      declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b.      awarding Plaintiffs and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

c.      awarding Plaintiffs and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d.      awarding such other relief as this Court deems appropriate.

**JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury.

Dated:  November 20, 2013                    **COHEN MILSTEIN SELLERS**
                                             **& TOLL PLLC**

                                             _____
                                             Michael Eisenkraft (ME-6974)
                                             88 Pine St., 14th Floor
                                             New York, NY 10005
                                             Tel.: (212) 838-7797
                                             Fax:  (212) 838-7745

Steven J. Toll
Daniel S. Sommers
S. Douglas Bunch (SB-3028)
Genevieve O. Fontan (GF-1906)
1100 New York Ave., N.W.
West Tower, Suite 500
Washington, DC  20005-3964
Tel.: (202) 408-4600
Fax: (202) 408-4699

*Attorneys for Lead Plaintiff Edward Paige and*
*Lead Counsel for the Class*

Kimberly Donaldson Smith
Catherine Pratsinakis
**CHIMICLES & TIKELLIS LLP**
One Haverford Centre
361 W. Lancaster Ave.
Haverford, PA  19041
Tel.: (610) 642-8500
Fax: (610) 649-3633

*Counsel for Plaintiff Delaware County Employees*
*Retirement Fund*

Peter Safirstein
Elizabeth Metcalf
**MORGAN & MORGAN, P.C.**
28 W. 44th St., Suite 2001
New York, NY  10036
Tel.: (212) 564-1637
Fax: (212) 564-1807

*Counsel for Plaintiffs Mark Hinnau and Mike*
*Gretschel*

Jonathan Gardner
Angelina Nguyen
**LABATON SUCHAROW LLP**
140 Broadway
New York, NY  10005
Tel.: (212) 907-0700
Fax: (212) 818-0477

*Additional Counsel for Plaintiffs*

84

CERTIFICATION OF PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

I, _____EDWARD J. PAIGE_____, ("Plaintiff") declare, as to the claims asserted under the federal securities laws, that:

1.     I have reviewed a class action complaint asserting securities claims against Magnum Hunter Resources Corporation ("Magnum" or the "Company") (NYSE:  MHR), and wish to join as a plaintiff retaining Cohen Milstein Sellers & Toll PLLC as my counsel.

2.     Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     My transactions in Magnum Hunter Resources Corporation ("Magnum" or the "Company") (NYSE: MHR) during the Class Period of January 17, 2012 through April 22, 2013, were as follows:

| DATE | TRANSACTION (buy/sell) | NO. OF SHARES | PRICE PER SHARE |
|------|------------------------|---------------|-----------------|
|      | SEE ATTACHED           |               |                 |
|      |                        |               |                 |
|      |                        |               |                 |
|      |                        |               |                 |
|      |                        |               |                 |

5.     During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in any action under the federal securities laws except as follows:

6.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing true and correct.

Executed this  8TH  Day of  JUNE , 2013.

_____

| Magnum Hunter Resources Corp. Transactions | | | |
| --- | --- | --- | --- |
| Class Period: January 17, 2012 to April 22, 2013 | | | |
| Trade Date | Transaction Type | Quantity | Price |
| 4/3/2012 | Purchase | 10,000 | $6.42 |
| 4/4/2012 | Purchase | 5,000 | $6.24 |
| 4/4/2012 | Purchase | 3,800 | $6.20 |
| 4/4/2012 | Purchase | 1,200 | $6.20 |
| 5/2/2012 | Purchase | 10,000 | $5.94 |
| 5/3/2012 | Purchase | 5,000 | $5.73 |
| 5/3/2012 | Purchase | 5,000 | $5.83 |
| 5/4/2012 | Purchase | 5,000 | $5.28 |
| 5/4/2012 | Purchase | 5,000 | $5.25 |
| 5/4/2012 | Purchase | 2,300 | $5.21 |
| 6/11/2012 | Purchase | 5,000 | $3.84 |
| 6/21/2012 | Purchase | 5,000 | $3.87 |
| 7/27/2012 | Purchase | 2,500 | $3.57 |
| 8/30/2012 | Purchase | 8,280 | $4.20 |
| 9/24/2012 | Purchase | 50,000 | $4.63 |
| 9/24/2012 | Purchase | 25,000 | $4.56 |
| 9/24/2012 | Purchase | 25,000 | $4.59 |
| 9/25/2012 | Purchase | 10,000 | $4.51 |
| 10/3/2012 | Purchase | 5,000 | $4.40 |
| 10/8/2012 | Purchase | 6,000 | $4.27 |
| 10/19/2012 | Purchase | 8,000 | $4.36 |
| 10/22/2012 | Purchase | 10,000 | $4.10 |
| 10/22/2012 | Purchase | 9,000 | $4.19 |
| 12/13/2012 | Purchase | 18,000 | $3.62 |
| 4/15/2013 | Purchase | 2,800 | $3.33 |
| 4/16/2013 | Purchase | 20,000 | $3.50 |

*Edward Ruiz* 6/8/13

## CERTIFICATION

I, Francis J. Catania, as Retirement Board Solicitor of the Delaware County Commissioners, hereby certify as follows:

1.       I have fully reviewed the facts and allegations of the complaint filed in this action against Magnum Hunter Resources Corporation (NYSE:MHR) ("Magnum Hunter") and its officers and directors alleging violations of the federal securities laws, and authorize the filing of a motion for appointment as lead plaintiff on behalf of Delaware County Employees Retirement Fund ("DelCo") in this action.

2.       DelCo did not purchase and/or acquire securities of Magnum Hunter at the direction of its counsel, or in order to participate in any private action under the federal securities laws.

3.       DelCo is willing to serve as lead plaintiff in this matter and as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.  I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon the execution of this Certification.

4.       DelCo's purchase and sale transactions from March 31, 2010 through April 16, 2013 (DelCo's proposed  class period) in Magnum Hunter common stock that are the subject of this action are set forth in Schedule A.

5.       During the three years prior to this Certification, DelCo has not sought to serve or served as a representative party for a class in any action filed under the federal securities laws.

6.       DelCo will not accept any payment for serving as a representative party on behalf of the class beyond its *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 24ʰ day of June, 2013.

_____
Francis J. Catania, as Retirement Board Solicitor of the
Delaware County Commissioners

## SCHEDULE A

**DelCo Transactions in Magnum Hunter Resources Corp. Securities**

| Security | CUSIP | Date | Purchase/Sale | Amount | Price |
|---|---|---|---|---|---|
| Common Stock | 55973B102 | 3/14/2011 | PURCHASE | 3,500 | $6.89 |
| Common Stock | 55973B102 | 3/16/2011 | PURCHASE | 4,547 | $7.02 |
| Common Stock | 55973B102 | 3/24/2011 | PURCHASE | 1,720 | $7.56 |
| Common Stock | 55973B102 | 4/7/2011 | PURCHASE | 2,360 | $8.30 |
| Common Stock | 55973B102 | 4/11/2011 | PURCHASE | 3,680 | $8.26 |
| Common Stock | 55973B102 | 7/5/2011 | PURCHASE | 3,174 | $7.01 |
| Common Stock | 55973B102 | 7/20/2011 | PURCHASE | 1,320 | $7.69 |
| Common Stock | 55973B102 | 7/22/2011 | PURCHASE | 2,743 | $7.55 |
| Common Stock | 55973B102 | 8/24/2011 | PURCHASE | 5,080 | $4.39 |
| Common Stock | 55973B102 | 10/17/2011 | PURCHASE | 43 | $4.13 |
| Common Stock | 55973B102 | 11/8/2011 | PURCHASE | 240 | $5.12 |
| Common Stock | 55973B102 | 11/30/2011 | PURCHASE | 1,341 | $4.66 |
| Common Stock | 55973B102 | 1/9/2012 | PURCHASE | 2,680 | $5.93 |
| Common Stock | 55973B102 | 4/3/2012 | SALE | -3,530 | $6.46 |
| Common Stock | 55973B102 | 5/11/2012 | PURCHASE | 8,310 | $4.50 |
| Common Stock | 55973B102 | 7/17/2012 | PURCHASE | 3,480 | $3.92 |
| Common Stock | 55973B102 | 4/22/2013 | SALE | -11,960 | $2.43 |
| Common Stock | 55973B102 | 5/31/2013 | PURCHASE | 8,160 | 3.4314 |
| Common Stock | 55973B102 | 6/10/2013 | PURCHASE | 12,245 | 4.0737 |

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, Mark Hinnau, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.  I have reviewed the complaint and I designate Morgan & Morgan P.C. as my counsel in this action for all purposes.

2.  I did not acquire Magnum Hunter Resources Corporation securities at the direction of plaintiff's counsel or in order to participate in any private action under the federal securities laws.

3.  I am willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4.  I will not accept any payment for serving as a representative party beyond its pro rata share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the court pursuant to law.

5.  I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years, except:

6.  I have made the following transactions in Magnum Hunter Resources Corporation during the Class Period specified in the complaint and will provide records of those transactions upon request:

| No. of Shares | Buy/Sell | Date | Price Per Share |
|---|---|---|---|
|  |  |  |  |
| See Attached Schedule A | | | |
|  |  |  |  |
|  |  |  |  |

**I declare under penalty of perjury that the foregoing is true and correct.**

Executed this 10TH day of October, 2013

Mark Hinnau

Schedule A

Mark Hinnau's Class Period Transactions in

**Magnum Hunter Resources Corporation**

Preferred C Shares

Purchase(s):

| Date | Quantity | Cost |
|------|----------|------|
| 4/12/2013 | 2000 | 25.37 |

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, Mike Gretschel , declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.  I have reviewed the complaint and I designate Morgan & Morgan P.C. as my counsel in this action for all purposes.

2.  I did not acquire Magnum Hunter Resources Corporation securities at the direction of plaintiff's counsel or in order to participate in any private action under the federal securities laws.

3.  I am willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4.  I will not accept any payment for serving as a representative party beyond its pro rata share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the court pursuant to law.

5.  I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years, except:

6.  I have made the following transactions in Magnum Hunter Resources Corporation during the Class Period specified in the complaint and will provide records of those transactions upon request:

| Security (Ticker) | No. of Shares | Buy/Sell | Date | Price Per Share |
|---|---|---|---|---|
| MHR.PR. D | 1110 | BUY | 8/7/2012 | 45.04 |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

**I declare under penalty of perjury that the foregoing is true and correct.**

Executed this 19 day of NOV , 2013

_____
Mike Gretschel